**UNITED STATES of America**
v.
**Darnell R. KINNARD, Appellant.**

**UNITED STATES of America**
v.
**Mahlon PAYNE, Appellant.**
**Nos. 24859, 24860.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 21, 1971.

Decided June 6, 1972.

As Amended July 13, 1972.

---

Mr. Thomas Owen Mann, Washington, D. C. (appointed by this Court), for appellant in No. 24859. Mr. Ben Paul Noble, Washington, D. C. (appointed by this Court), was on the brief for appellant in No. 24859.

Mr. A. Robert Cherin, Washington, D. C. (appointed by this Court), for appellant in No. 24860.

Mr. David G. Larimer, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Donald T. Bucklin, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and ADAMS,* Circuit Judge, United States Court of Appeals for the Third Circuit.

PER CURIAM:

██ The court unanimously agrees to affirm the conviction of the appellant Kinnard. Chief Judge Bazelon and Circuit Judge Leventhal agree to reverse the conviction of appellant Payne. The rulings of the trial judge below precluded an inquiry into the general unreliability of addict-informers; restricted defense counsel's efforts on cross-examination to develop extrinsic evidence concerning the informant's addiction; and in practical effect, foreclosed a request from defense counsel for a special instruction on the credibility of addict-in-

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1964).

formers. In view of the fact that the informant's testimony lacked corroboration on a material point, these rulings were prejudicial error. Circuit Judge Adams dissents from the reversal of Payne's conviction.

BAZELON, Chief Judge:

In this case we are confronted with some of the disturbing consequences of the Government's employment, as informers, of narcotics users, addicts and individuals accused of violating the narcotics laws. We do not dispute the Government's right to use such informers to infiltrate the drug traffic in order to enforce these narcotics laws. But the facts of this case do present us with the question of whether and how the testimony of these informers should be received.

## I.

Appellants Kinnard and Payne were tried jointly for the crimes of possession, failure to pay tax, and the sale of heroin.[1] These charges arose out of a sale of the drug arranged by a government informer, Robert Roscoe Jr., to take place between Kinnard, Payne and a government narcotics agent. The pertinent facts of the case are gleaned from the trial transcript.

In late August or early September of 1969, Roscoe was in custody in the District of Columbia, charged with four counts of possession of narcotics, the sale of narcotics, and burglary. Roscoe was an admitted user of heroin, although whether this use amounted to addiction is a fact which remains in dispute.[2] In conversations with a government attorney, Roscoe indicated that he was interested in assisting the Bureau of Narcotics and Dangerous Drugs as an informer, and was told by the Bureau that any assistance he provided would be reported to the United States Attorney's office, presumably to weigh

in his favor. In point of fact, Roscoe was quickly released from custody. The charges against him were subsequently reduced to two misdemeanors to which he pleaded guilty and received two years' probation. In the course of his work with the Bureau, Roscoe also received at least $200 and his family was relocated at the Government's expense.

After his release, Roscoe met several times with Agents Cooper and Jackson from the Bureau of Narcotics. Roscoe mentioned the names Mahlon Payne and Darnell Kinnard as being two individuals involved in the drug trade in the District. Roscoe also apparently volunteered to set up a sale with these individuals.

Pursuant to this plan, Roscoe visited the appellant Mahlon Payne. Roscoe testified that he visited Payne on several occasions but arranged no sale.[3] On the afternoon of October 13, 1969. Agent Cooper observed Roscoe enter Mahlon Payne's apartment and emerge about forty-five minutes later. Roscoe reported that he could return that evening to make a purchase from Payne for a friend from North Carolina. Agent Jackson was to assume the role of that friend.

Jackson and Roscoe returned to Payne's apartment that evening. They testified that Payne said he could obtain $400 worth of heroin, and that they should accompany him to make a telephone call. The three drove to a gas station where Payne made the call, and then drove to the parking lot of a shopping center and bowling alley. Agent Jackson testified that Payne left the car and spoke with a man who had driven up in a Plymouth automobile, and whom Roscoe identified at the time as Darnell Kinnard.

When Payne returned to the car, the three drove to the parking lot of a carryout restaurant to await delivery of the heroin. Payne noticed several police

---

1. 26 U.S.C. §§ 4704(a), 4705(a) and 21 U.S.C. § 174.

2. *See* p. 573 *infra*.

3. Transcript p. 238.

cars in the area, so they left and crossed the street to the Shrimp Boat Carryout to wait. Agent Jackson testified that he presently saw the man identified as Kinnard drive up to the first restaurant.

Payne motioned Kinnard over to the Shrimp Boat. Roscoe and Payne then got out of the car and spoke with Kinnard. Agent Jackson observed Kinnard pass an envelope to Roscoe. Roscoe walked over to Jackson in the car and handed him the envelope, which was introduced at trial as containing the narcotic heroin. Four hundred dollars passed from Agent Jackson to Payne to Kinnard. Kinnard and Payne drove off in the Plymouth, and Jackson and Roscoe returned to the Bureau of Narcotics. The entire transaction was observed at some distance by Agent Cooper.

The defendants Kinnard and Payne did not take the stand to present a conflicting version of the facts of their encounters with Roscoe and Jackson. Instead, they sought through cross-examination to impeach the credibility of those who testified against them, and emphasized in their closing arguments the crucial role played by Roscoe in inducing their participation in the sale. Thus the thrust of their defense was to raise the question of entrapment. They requested, and were granted the customary instruction on an entrapment defense.[4]

In this appeal, appellants raise two issues of merit.[5] First, during the cross-examination of Agent Jackson, defense counsel attempted to elicit the Agent's opinion on the general reliability and truthfulness of narcotics addicts. The trial judge halted this inquiry and stat-

ed that, in reliance on Godfrey v. United States[6] he would not give any special instructions on the unreliability of addicts. Defense counsel objected to the foreclosure of his inquiry and appellate counsel now claims that such an instruction should have been given.[7]

Second, during cross-examination of Roscoe, the defense sought to impeach his credibility by use of extrinsic evidence to prove the frequency of his drug use and the most recent occurrence of such use. The defense first requested that Roscoe bare his arms before the jury, and later suggested that an examination be conducted at Government expense by a dermatologist or other expert to ascertain these facts. Both requests were denied as raising collateral questions and are claimed as error on this appeal.

Judge Leventhal and I hold for appellants on both issues. When, as in this case, the Government relies on the testimony of an informer about whom there is suspicion of past or current narcotics addiction, the court must permit the defendant to develop extrinsic evidence to ascertain the informer's status as an addict. If such status is determined, I would hold that the court must provide an explicit cautionary instruction on the unreliability of paid informers who are also drug addicts. In Judge Leventhal's opinion, the court's duty to issue such an instruction arises if the addict's testimony is without corroboration in some significant aspect of the case, and there is a request from defense counsel.

We both agree that the availability of such an instruction is of vital necessity to preserve the rights of the defendant

---

4. The importance of the entrapment defense for appellants' case is discussed at p. 576 *infra*.

5. We have examined appellant Payne's contentions that the entrapment defense was established in his case as a matter of law, and that no evidence proved he was a seller of the drug. Both issues were properly for the jury. Appellant Kinnard's objection to the alleged presence of a part-

time law student on the jury is without merit.

6. 122 U.S.App.D.C. 285, 353 F.2d 456 (1965). For a discussion of this case, see p. 571 *infra*.

7. *See* Transcript pp. 134–36. Although Rule 30, Fed.R.Crim.P. was not precisely complied with, we consider that the question of the necessity of a special instruction is properly before this court.

to cross-examination and to proper jury instructions. Application of this rule to the case before us requires reversal only of the appellant Payne's conviction and a new trial for him.

## II.

This decision is based on a history of judicial opinions which underscore the necessity of special cautionary instructions when paid informants testify for the Government in criminal cases. The principle which guides us is that enunciated by this court in Fletcher v. United States:

"Granting that the credibility of the testimony of a paid informer is for the jury to decide, it nevertheless follows that where the entire case depends upon his testimony, the jury should be instructed to scrutinize it closely for the purpose of determining whether it is colored in such a way as to place guilt upon a defendant in furtherance of the witness's own interest. Here, admittedly, the usefulness of the witness—and for which he received payment from the agent—depended wholly upon his ability to make out a case. No other motive than his own advantage impelled him

in all that he did." 81 U.S.App.D.C. 306, 307, 158 F.2d 321, 322 (1946). The court thus recognized that informers have a motive to lie, and that this danger creates the necessity for a special instruction on their unreliability.[8]

Other Circuits have approved Fletcher[9] and we have held that when the instruction is requested, a failure to give it is reversible error unless the informer's testimony is fully corroborated by other eyewitnesses.[10] We have also urged trial courts to caution the jury about the unreliability of informant testimony even in the absence of a request.[11]

These principles also govern cases involving addict-informers. We believe that a government informer's addiction to narcotic drugs and his indictment for narcotics violations so increase the danger that he will color his testimony to place guilt on the defendant for his own benefit that this special danger should be recognized by courts and flagged by a special charge to the jury.

This belief is grounded in the hard realities of narcotics law enforcement. The use of informers is the primary police technique in this field[12] since addicts are the primary sources of information about the drug trade.[13] Law enforce-

8. This same analysis applies in cases involving other types of witnesses with strong motivation to lie, e. g. accomplices. United States v. Jones, 425 F.2d 1048 (9th Cir.), cert. denied, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970); McMillen v. United States, 386 F.2d 29 (1st Cir.), cert. denied, 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1967); Williamson v. United States, 332 F.2d 123 (5th Cir. 1964); Egan v. United States, 52 App.D.C. 384, 287 F. 958 (1923).

9. Orebo v. United States, 293 F.2d 747, 750 (9th Cir. 1961); Joseph v. United States, 286 F.2d 468, 469 (5th Cir. 1960); United States v. Masino, 275 F.2d 129, 133 (2d Cir. 1960).

10. Hardy v. United States, 119 U.S.App. D.C. 364, 343 F.2d 233 (1964) cert. denied, 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965). Other Circuits have ignored the requirement of a request when the informer's testimony is crucial and uncorroborated. United States v. Griffin,

382 F.2d 823, 829 (6th Cir. 1967). Cf. McMillen v. United States, supra note 8, 386 F.2d 29; Williamson v. United States, supra note 8, 332 F.2d 123.

11. Cratty v. United States, 82 U.S.App. D.C. 236, 163 F.2d 844 (1947).

12. See A. Lindesmith, The Addict and the Law, at 35 (1965) [Hereinafter Lindesmith]; and J. Skolnick, Justice Without Trial, at 120 (1966) [Hereinafter Skolnick]: "Without a network of informers—usually civilians, sometimes police—narcotics police cannot operate."

13. The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Narcotics and Drug Abuse, at 8 (1967) [hereinafter Task Force Report].
"In order to make their way into the tolls of the illicit traffic it is . . . necessary for the police to use artificial leverage of some sort to obtain information and evidence and to secure reluc-

ment officials are open about their use of informants,[14] but there is less discussion about why their informers perform.

The addict's habit makes him uniquely subject to constant surveillance and susceptible to arrest—he is in a perpetual status of violating the law.[15] For the addict, arrest is harrassment of a special sort, for he is forced to undergo the beginnings of withdrawal symptoms.[16] At this stage, a bribe of heroin or the promise of immediate release and return to the habit seem irresistable.[17] The deliberate harassment of addicts for information, through illegal searches, arrests and general intimidation by police and other officials, has been reported.[18]

Probably the most effective tools to induce information and cooperation from addicts under indictment are offers of leniency from the severe mandatory penalties of narcotics violations.[19]

Furthermore, the addict is only valuable if he produces fruitful tips or arranges sales which lead to prosecutions. The addict-turned-informer may therefore be desperate not only to produce results for the police, but also to avoid retribution from powerful figures in the drug trade.[20] This desperation may well lead him to lie, and increases the danger that he will misrepresent the involvement of those whom he fingers.[21]

Several courts have commented that these pressures make the testimony of an addict inherently unreliable.[22] In Godfrey v. United States, the case on which the court below relied in denying

---

tant cooperation from participants in the traffic. This entree into the illegal distribution system is usually provided initially by addicts acting as informers or 'special employees.'" Lindesmith at 35.

14. *See e. g.,* M. Harney & J. Cross, The Informer in Law Enforcement (1960).

15. "[T]he addict lives in almost perpetual violation of one or several criminal laws, and this gives him a special status not shared by other criminal offenders. Together with the fact that he must have continuous contact with other people in order to obtain drugs, it also gives him a special exposure to police action and arrest. . . ." Task Force Report at 10. *See also* Lindesmith at 46.

16. "Among the symptoms of the withdrawal sickness, which reaches peak intensity in 24 to 48 hours, are muscle aches, cramps, and nausea." Task Force Report at 2. These symptoms are so painful that they are used as a brutal technique to elicit information from addicts. Duster, Legislation of Morality—Law, Drugs, and Moral Judgment, at 21 (1970) [hereinafter Duster]. This treatment, though effective, is extremely detrimental to the addict's health. Lindesmith at 38, 47.

17. *See* Duster at 194–95. Drugs are turned over to addict-informers in a variety of ways. Lindesmith at 44, 47, 50–51.

18. These arrests are made for information only, not with expectation of prosecution. Arthur D. Little, Inc., Drug Abuse and Law Enforcement, at 84 (1967). The most dramatic revelation of this practice was in the Daniel Committee Hearings in

1955: Illicit Narcotics Traffic: Hearings before the Subcommittee on Improvements in the Federal Criminal Code of the Committee on the Judiciary, U.S.Senate, 84th Cong., 1st sess. (1955–1956), also reported in Lindesmith, at 36–37. *See also* Task Force Report at 8, and Skolnick at 143–155.

19. That addict-informers are given a "break", such as reduction of charges, is freely admitted. Task Force Report at 8, 11. *See also* the discussion of the Daniel Committee investigations in Lindesmith, at 48–49, and Skolnick at 124–26. In the context of this case we do not need to reach the question of whether equal pressures are at work on addicts who are not under indictment.

20. *See* Skolnick at 132–33.

21. Lindesmith supports this conclusion at 45–50. The special dangers of addicts' testimony in entrapment cases is noted in note 51 *infra.*

22. This court stated in *Fletcher, supra,* 81 U.S.App.D.C. at 307, 158 F.2d at 322: "a drug addict is inherently a perjurer where his own interests are concerned, it is manifest either that some corroboration of his testimony should be required, or at least that it should be received with suspicion and acted upon with caution."

The Sixth Circuit has stated in United States v. Griffin, 382 F.2d 823, 828 (1967):

"Obviously, the testimony of [the addict-informer] was highly suspect, . . ." citing *Fletcher.*

a special instruction,[23] this court rejected the use of an instruction aimed at discrediting the testimony of all drug addicts simply because of their addiction.[24] We are concerned with the unreliability of a far narrower category of witnesses—namely, *narcotics addicts who are paid informers for the Government with criminal charges pending against them.* We must now recognize that there is a special danger that such government informers will lie.

## III.

We are faced with the problem of how best to counteract this danger. The Government's use of infiltrators and informers to combat the drug trade may well be a necessity, and is not unconstitutional *per se.*[25] It has been established that their testimony may be used to obtain convictions, even if it is uncorroborated.[26] But when they do testify at trial, the court must exercise special care to protect the defendant's right to the "established safeguards of the Anglo-American legal system"[27]— cross-examination and proper instructions to the jury.

Therefore, the majority of this court today holds that in order to save the defendant's rights from "substantial prejudice,"[28] the trial court should be prepared to caution the jury to weigh with extreme caution the testimony of an addict-informer that is uncorroborated in some material respect, because of the possibility of the addict's special interest and motive to fabricate.

The writer of this opinion would hold that this charge should be offered by the court upon its own motion. Since this court has decided that as a matter of accepted knowledge and experience

And Judge Miller of this Court, writing in dissent in Godfrey v. United States, 122 U.S.App.D.C. at 289, 353 F.2d at 460 stated:

"During the last fifty years I have had many opportunities to observe the way drug addicts testify in criminal cases about matters which concern their own interests. On the basis of that experience, I believe [the trial judge] was correct in saying they are inherently perjurers and I see no reason why a jury should not be told this fact of life."

23. The court instructed that:

"It is recognized that a drug addict is inherently a perjurer when his own interests are concerned and his testimony should be received with suspicion and acted upon with caution." *Id.* at 287, 353 F.2d at 458.

24. Several addicts had testified at the trial, one of whom was the defendant. The majority rejected the use of the instruction on the grounds that it was aimed directly at the defendant; that as a general comment on all addicts it was "obviously erroneous"; and that the phrase "it is recognized" made the instruction a too concrete and emphatic comment on the evidence.

United States v. Green, 327 F.2d 715 (7th Cir. 1964), which also rejected an instruction on addicts, is likewise distinguishable since in that case there was evidence that the witness was no longer an addict, and there was no indication that he was an informer.

25. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). Courts have not assumed the task of adjudicating the propriety of law enforcement techniques, or regulating the "dirty business" of using guile, secret informers and infiltrators to obtain arrests. In *On Lee*, Mr. Justice Frankfurter wrote in dissent that a criminal prosecution should not be "a dirty game in which 'the dirty business' of criminals is outwitted by 'the dirty business' of law officers. . . . It is most uncritical to assume that unless the Government is allowed to practice 'dirty business' crime would become rampant or would go unpunished." 343 U.S. at 758, 760, 72 S.Ct. at 974.

26. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

27. Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966).

28. Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. Griffin, *supra* note 10, 382 F.2d at 829; Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633 (1942), cert. denied, 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943).

there is an increased danger that addict-informers will lie, I believe there is no substitute for a charge to this effect from the trial judge. I am skeptical about the value of a debate between witnesses over the reliability of addict-informers—an alternative to which the concurring opinion refers. In my view, in cases where the credibility of an addict-informer is at issue, the judge should not rely on defense counsel to request so important an instruction.

The rule I propose is not directed at law enforcement practices, and involves no danger that a criminal will be set free because the constable stumbled. Rather, I am concerned that the innocent not be convicted because a lawyer stumbled.

Furthermore, it places no added burden on the court to protect the defendant's right to this instruction. The instruction does not relate to a defendant's particular "theory" of the case, nor is the trial judge unaware of the circumstances which necessitate it. When an addict-informer testifies against a defendant, the judge is put on notice that an instruction on credibility should be submitted to counsel as part of the routine set of instructions which the trial court offers.[29]

Placing this duty on the court not only saves time at trial, but also reduces the number of appeals premised on the failure of defense counsel to request such an instruction. The rights of, in most cases, indigent defendants, should not be jeopardized by the inexperience or oversights of their appointed counsel.[30]

For these reasons, it seems an exceedingly small but important step for us to move from "hoping" that the trial court will be vigilant enough to provide such an instruction, especially in cases involving appointed counsel, to "requiring" him to do so.[31]

At a minimum, however, Judge Leventhal and I agree that upon request this special instruction be available.

## IV.

Applying this rule to this case, we are faced with the question of whether the appellants were entitled to the special instruction outlined above. This depends first on whether the Government informer, Roscoe, was a narcotics addict —either at the time of trial or when he operated as a police informer.[32] Both prosecution and defense counsel asked this question of Roscoe, and both his replies were in the negative. Upon further inquiry by the defense into the frequency of his narcotics use, Roscoe responded that he was only an occasional user.

Thereupon, the defense sought to ascertain the frequency of Roscoe's drug usage by inquiry into extrinsic evidence —namely, an examination of Roscoe's arms for needle tracks. This inquiry was foreclosed by the trial court as raising issues collateral to the trial and as improper impeachment.

Ordinarily, extrinsic evidence may not be used to impeach a witness's general credibility or his specific testimony on a collateral matter.[33] But evidence which is probative of a special *motive* to lie or fabricate a case against a defendant is

---

29. At this point, the defendant could object to the court's instruction if it in any way prejudiced his defense.

30. This court has resolved this same dilemma in another context by urging trial judges to inquire *sua sponte* whether objections are going to be raised to identification procedures in criminal cases. Solomon v. United States, 133 U.S.App.D.C. 103, 408 F.2d 1306 (1969).

31. As this court has already done for an identification instruction, Macklin v. Unit-

ed States, 133 U.S.App.D.C. 139, 409 F.2d 174 (1969); United States v. Shelvy, 148 U.S.App.D.C. 1, 458 F.2d 823 (1972).

32. At both times the pressures on an addict-turned-informer would enhance his motivation to lie.

33. Tinker v. United States, 135 U.S.App. D.C. 125, 128 n. 16, 417 F.2d 542, 545 n. 16, cert. denied, 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969); Lee v. United States, 125 U.S.App.D.C. 126, 368 F.2d

admissible because it bears directly on the issue of the defendant's guilt.[34] This is a crucial distinction which the dissenting opinion seems to ignore. The discussion above focuses on the fact that the addict-turned-informer may have a special and very powerful motive to fabricate a case for his own benefit. His motive, and therefore his addiction, are highly material to his testimony at trial. The trial court below erred in refusing to allow the defendants in this case to attempt to prove the fact of Roscoe's addiction with extrinsic evidence.

Furthermore, in light of the special cautionary instruction which was discussed above, the possible addiction of a government informer under indictment for narcotics violations must not remain in doubt. The defendant's right to have the jury receive the special instruction is jeopardized if the informer can simply deny addiction. If the defense is bound by a witness's denial, our recognition of the importance of the cautionary instruction is meaningless. Extrinsic evidence, if it exists, must be admitted to refute this denial.

It is well-recognized that the scope and extent of cross-examination and impeachment of a witness are generally within the discretion of a trial judge, who may exclude false insinuations and groundless accusations,[35] as well as evidence which needlessly debases the character of a witness and is merely cumulative and repetitive.[36] However, for the trial judge to foreclose entirely the inquiry into extrinsic evidence tending to prove the added motive of a government informer to lie is an erroneous application of these principles of law.[37] In order to protect against needless prejudice, the initial exploration of an informer's status as an addict can easily be held outside the presence of the jury.

In the case before us, it was suggested by defense counsel that an expert be called to examine Roscoe's arms for indications of extensive intravenous narcotics use, probative of addiction. This surely is one possible avenue of inquiry.[38] We cannot at this point formulate specific rules as to what will or will not be admissible to prove a current or former state of narcotics addiction. As

834 (1966); Ewing v. United States, *supra* note 28, 77 U.S.App.D.C. 14, 135 F.2d 633.

34. Tinker v. United States, *supra* note 33, 135 U.S.App.D.C. at 127, 417 F.2d at 544; Wynn v. United States, 130 U.S.App.D.C. 60, 397 F.2d 621 (1967); Villaroman v. United States, 87 U.S.App.D.C. 240, 184 F.2d 261 (1950). *See also* Salgado v. United States, 278 F.2d 830, 831 (1st Cir. 1960); United States v. Lester, 248 F.2d 329, 334 (2d Cir. 1957).

35. *See* United States v. Pugh, 141 U.S.App. D.C. 68, 71, 436 F.2d 222, 225 (1970).

36. This court held in Tinker v. United States that it was not an abuse of discretion for the trial judge to exclude evidence for the following reasons:

"Evidence of homosexuality has an enormous proclivity for humiliation and degradation of a participant in a fashion completely unrelated to testimonial honesty. The record before us makes evident the trial judge's concern that the witness' claim that the officer had engaged in homosexual conduct would unfairly debase him in the eyes of the jury. Even where testimony of that sort has

some tendency to connote motivation, any exercise of judicial discretion worthy of the name necessitates consideration of these adverse effects. Here the proferred evidentiary items could have legitimately added little to appellant's substantial presentation while their illegitimate propensities loomed large." (footnotes omitted). 135 U.S.App.D.C. at 127–128, 417 F.2d at 544–545.

37. In Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931), the Supreme Court held that it was an abuse of discretion and prejudicial error to "cut off *in limine* all inquiry on a subject with respect to which the defense was entitled to a reasonable cross examination."

38. Urinalysis, onset of withdrawal symptoms and testing for tolerance to heroin are other possible means of proving a current state of addiction. Hospital or prison records which indicate a history of addiction or withdrawal symptomatology would also be probative evidence. We assume, but do not decide, that any such evidence in the hands of the Government would be subject to the rule of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct.

attempts at proof are offered at trials in the future, both trial and appellate judges will have the opportunity to examine and test the problems of proving this issue of fact. We hold only that if evidence is presented by the defense that a paid government informer is also an addict and under indictment for narcotics violations,[39] this evidence must be presented to the jury along with the special cautionary instruction outlined above.

It is no excuse in this case that the inquiry suggested by defense counsel was cut off because he made no detailed proffer of what a dermatologist or other expert could have testified about Roscoe's arms. Of course this groundwork should be accomplished before trial, but in this case, as is usual, we are dealing with appointed counsel who operates with severe constraints on both his time and his funds. In this context, defense counsel should have some leeway to explore this issue even at the time of trial if we are to make our adversary system work effectively for the defendant.[40] Once it is recognized that this issue is highly relevant when an addict-informer testifies, lawyers will learn to investigate before trial and will not unduly delay the criminal process.

Since appellants' inquiry into Roscoe's addiction was erroneously curtailed, we must assume for purposes of this appeal that Roscoe was an addict and that Kinnard and Payne were entitled to the special cautionary instruction on addict-informers. The rulings of the trial judge which, in effect, precluded a request for such an instruction, thus constituted error.

V.

It remains to be decided whether appellants are entitled to reversal of their convictions and a new trial.[41] This determination depends on whether the erroneous omission of the special instruction in fact worked "substantial prejudice"[42] to either Kinnard or Payne. Failure to give the instruction is prejudicial when the addict-informer's testimony contributes a material aspect of the prosecution's case, and it is not fully corroborated by other witnesses.[43]

Application of this test requires a careful examination of the record and

1194, 1196, 10 L.Ed.2d 215 (1963):
. . . "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

39. Either at the time of trial or while the informer was operating for the Government, see note 32 supra.

40. See Dawkins v. United States, 324 F.2d 521, 523 (9th Cir. 1963). We cannot ignore the very serious problems of effective assistance of counsel raised by the use of appointed counsel whose expertise in the field of criminal law is limited. See generally, Bazelon, New Gods for Old: "Efficient" Courts in a Democratic Society, 46 N.Y.U.L.Rev. 653, 667–673 (1971).

41. At a new trial, the defendants would be allowed to submit extrinsic evidence of Roscoe's addiction if he testifies and could assert their right to the special cautionary instruction.

42. This test is established in Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. Griffin, supra note 10, 382 F.2d at 828–829; Lindsey v. United States, 77 U.S. App.D.C. 1, 133 F.2d 368 (1942).

43. Accord, Hardy v. United States, supra note 10, 119 U.S.App.D.C. 364, 343 F.2d 233. See also United States v. Jones, supra note 8, 425 F.2d 1048; Williamson v. United States, supra note 8, 332 F.2d 123. I fully subscribe to the reasoning upon which Judge Leventhal concludes that it is no reflection upon the trustworthiness of police officers that the testimony of an officer involved in undercover arrangements will not in every case provide sufficient corroboration to negate the need for a cautionary instruction on addict-informers. I therefore join him in urging trial courts to give the cautionary instruction where the only corroboration of an addict-informer is from an officer involved in such arrangements.

ascertainment of the testimonial source of the incriminating evidence against both appellants. Neither disputes that the sale took place, or that they were participants in the transaction. Roscoe's version of the sale itself was fully corroborated by Agent Jackson, who was present, and by Agent Cooper, who observed from a distance and identified both defendants.

Thus the only subject on which Roscoe furnished important and uncorroborated testimony was the nature of his negotiations with appellant Payne which preceded the sale itself. This subject is of critical importance in Payne's case, since his entire defense was that of entrapment. The crucial point to be determined was whether Payne was *induced* to commit the crime, or whether he was *predisposed* to do so and was merely afforded the opportunity by the Government.[44]

This issue was properly submitted to the jury since the Government was acting through Roscoe, its paid employee.[45] Roscoe's testimony about the course of his negotiations with Payne would undoubtedly weigh heavily in the jury's determination of Payne's predisposition to sell heroin. Roscoe indicated that he exerted no pressure on Payne, and that he had made prior purchases from Payne.[46] On the other hand, he also testified that he had visited Payne several times without arranging a sale, which might indi-

cate that Roscoe had to make some persuasive efforts.[47]

Roscoe's testimony does not make out the entire case for Payne's predisposition to commit the crime. Agent Jackson testified about Payne's willingness during their first meeting,[48] and also stated that Payne was willing to sell him some cocaine.[49] Both Agents testified that they had heard appellant's name previously linked to the narcotics trade.[50] However, Roscoe's testimony was far from negligible and the facts he stated were uncorroborated. Thus his credibility was a material factor in the jury's resolution of the entrapment issue[51] and had the special instruction on addict-informers been given, the jury might have had a reasonable doubt[52] that Payne was all that Roscoe portrayed him to be —a ready and willing seller.

In these circumstances, prejudice resulted from violations of Payne's right to full cross-examination of Roscoe and to a properly instructed jury. The dissent asserts that sufficient impeaching evidence was brought out in Roscoe's cross-examination to justify the trial judge's calling a halt when he did. This argument sidesteps our holding that the status of addiction is evidence of unreliability, and that the Government's right to use such informers as witnesses is offset by the defendant's right to an instruction, if in any material respect the Government's case is established by the

---

44. Sherman v. United States, 356 U.S. 369, 371–372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 451–452, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

45. The *Sherman* case involved a government informer who was not paid for his efforts. 356 U.S. at 373, 78 S.Ct. 819, 2 L.Ed.2d 848. *See also* Johnson v. United States, 115 U.S.App.D.C. 63, 317 F.2d 127 (1963).

46. Transcript pp. 187–89, 237–39.

47. Transcript p. 238.

48. Transcript p. 107.

49. Transcript p. 122.

50. Transcript pp. 134, 152.

51. *Accord*, Notaro v. United States, 363 F.2d 169, 173 (9th Cir. 1966). That the actions of an informer must be viewed with special caution when the entrapment defense is raised is implicit in Sherman v. United States, *supra* note 44, 356 U.S. at 374–376, 78 S.Ct. 819.

52. We disagree with the dissent's contention that in order for the jury to acquit these defendants it would have to reach a "rational conclusion" that they were entrapped. This contention seems to cast some doubt on the government's burden to prove its case beyond a reasonable doubt. *See* Notaro v. United States, 363 F.2d 169, 175 (9th Cir. 1966); Hansford v. United States, 112 U.S.App.D.C. 359, 303 F.2d 219 (1962).

uncorroborated testimony of an addict, that his testimony must be viewed with caution because of the possibility of his special interest and motive to fabricate.

We need not be convinced that the jury's verdict would have been different had the proper instruction been given.[53] Its absence worked substantial prejudice to Payne which must now be eradicated.

Kinnard was not similarly prejudiced, although he raised the entrapment defense as well. Roscoe's credibility was not a material factor in the prosecution's case against Kinnard, since the record indicates that Roscoe never met alone with Kinnard and had no opportunity to induce his cooperation.[54] Roscoe also did not testify about Kinnard's willingness to sell narcotics, and his comment about making a prior purchase from Kinnard was of negligible importance in the context of the prosecution's entire case.[55]

Accordingly, only Payne's conviction must be reversed.

LEVENTHAL, Circuit Judge, concurring:

I concur in the reversal of Payne's conviction and affirmance of Kinnard's. Although I agree with much, perhaps most, of Chief Judge Bazelon's opinion, there are important differences in approach and emphasis that lead me to state my views separately.

## I.

Addict informants present a serious problem of unreliability, for the reasons developed by Judge Bazelon, yet today's crime problem requires the use of such informants, and court rules should not tamper unduly with the system, sacrificing the security of society without an advance in rights and liberties. The question is, how to retain addict informants, yet keep reasonable rein on them and the problems they present. The best available answer lies in the approach of using the evidence, even without corroboration, but supplying latitude for cross-examination, and cautionary instructions on unreliability when corroboration is lacking on a material aspect of their testimony.

This is the approach put forward in On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) where Justice Jackson said (p. 757, 72 S.Ct. p. 973):

> The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are "dirty business" may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions.

Therefore, I agree with Chief Judge Bazelon that a defendant is entitled to a "careful" instruction, on request, concerning the unreliability of an informant who is an addict, if in any material aspect that addict-informant's testimony is not corroborated. That is a sound application of the principle of *Fletcher* [1] and there is no decision of this court to the contrary.

I limit my statement to the necessities of this case, which do not require a ruling beyond the duty to give an instruction on request. But I should be remiss if I did not add my hope that the trial judge would be vigilant and concerned enough to provide such an instruction

53. *See* Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); and United States v. Griffin, *supra* note 10, 382 F.2d at 829.

54. Kinnard may nevertheless have been entitled to have the question of entrapment go to the jury. *See* Johnson v. United States, *supra* note 45, 115 U.S.App. D.C. 63, 317 F.2d 127.

55. Testimony about Kinnard's involvement in the narcotics trade was stronger than against Payne. *See* Transcript at pp. 167, 168. It is also of considerable weight that Kinnard was able to produce 400 dollars worth of heroin upon a single brief meeting with Payne.

1. Fletcher v. United States, 81 U.S.App. D.C. 306, 158 F.2d 321 (1946).

even in the absence of request, the more so in any case when defense trial counsel has been appointed by the court, and does not specialize in criminal law practice.[2] Furthermore, the judge would be "well advised" to give such a cautionary instruction,[3] particularly when the only corroboration comes from another person, even a police officer, who was involved, whether as participant or surveillant, in the use of undercover arrangements.[4] And there may well be a requirement for such an instruction when the circumstances of the case, other than his status as an addict-informant, are such as to cast serious doubt on the witness's veracity and put it under a cloud.[5]

2. Dawkins v. United States, 324 F.2d 521, 523 (9th Cir. 1963).

3. Cratty v. United States, 82 U.S.App. D.C. 236, 242, 163 F.2d 844, 850 (1947).

4. See Hardy v. United States, 119 U.S.App. D.C. 364, 343 F.2d 233 (1964), cert. denied, 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed. 2d 276 (1965). Judge Washington, dissenting, was of the view that an undercover police officer had such a similarity of interest as the informant that it was not "corroboration" adequate to obviate the requirement of a warning to the jury. Judges Miller and Burger declined to find error but noted that "generally the trial court would be 'well advised' to [give the cautionary instruction] and would have been on sounder ground had it given the cautionary instruction here." The concern is not that a police officer is less trustworthy than another witness, but that a police officer in undercover work may not have a sufficient independence of interest from the informant to obviate the desirability of caution concerning the testimony of the informant. The indication, from all three judges in *Hardy*, of the wisdom of a cautionary ruling concerning the testimony of an informant, notwithstanding the corroboration of a police officer, is in no wise inconsistent with the ruling of Judge Burger that a defendant is not entitled to an instruction that the testimony of a police officer is to be viewed with suspicion, see Bush v. United States, 126 U.S.App.D.C. 174, 375 F.2d 602 (1967). As *Bush* points out, the testimony of a police officer is not to be viewed with suspicion merely because he is an undercover agent, although the officer is subject to impeachment, cf.

## II.

The need for this court to rule on the duty to give an instruction on request stems out of the rulings of the trial judge in another context, rulings which interfere with the latitude *On Lee* cautioned should be available to develop evidence on unreliability.

On cross-examination of Agent Jackson, defense trial counsel,[6] having established that it was Roscoe who first mentioned the names of these defendants to the Government agents, sought to cross-examine concerning the unreliability of addict informers.[7]

The trial judge restricted these questions, ruling that even if Roscoe were an addict,[8] "the Court of Appeals has said

Zebedee Hardy v. United States, 118 U.S. App.D.C. 253, 254, 335 F.2d 288, 289, (1964), and to the testing of probing cross-examination, just like any other witness.

5. Williamson v. United States, 332 F.2d 123 (5th Cir. 1964).

6. These matters relate to cross-examination by counsel for Kinnard, but since he cross-examined prior to counsel for Payne, who was bound by the rulings, the errors are before us on Payne's appeal.

7. The question that led to the ruling was: "Do you have any experience or any knowledge about the reliability of narcotic addicts, insofar as telling the truth or being reliable or being accurate or even caring who they hurt or don't hurt so long as they are not put in jail?"
    While this was objectionable in form as a compound question, its thrust is reasonably plain. It asks concerning the unreliability as informants of addicts, who are enabled by their passing on of information to avoid the consequence they dread of being subject to "cold turkey" withdrawal by being put in jail.

8. Although the trial judge at one point said there was no foundation for the question, he receded from that position when defense counsel inquired whether his approach would be permitted if he proffered evidence to show that Roscoe were an addict. The court said that an instruction on addiction would be impermissible, and hence the evidence was inadmissible. This is the pertinent transcript (Tr. 134–135):
    (At the bench)
    THE COURT: Judge Pine gave such an instruction about narcotic addicts

that it would be error to instruct the jury that an addict's testimony is unreliable simply because he is an addict." The judge was mistaken in his apprehension of the rule of the decision on which he relied, Godfrey v. United States, 122 U.S.App.D.C. 285, 353 F.2d 456 (1966). *Godfrey* held it was reversible error to instruct the jury that addicts are inherently perjurious—in a context where some witnesses, who were addicts, were not informers, and were indeed defense witnesses. But a different situation applies to a witness who is both an addict and an informant.

The judge's mistake in assuming that a special instruction on addict-informants could not be sought was material, for it led him to the error of excluding the question put to Agent Jackson on cross-examination.

Moreover, I think the defense is entitled to bring out before the jury the special unreliability of an informant who is also an addict, whether or not there is an instruction. Indeed, I would feel the trial counsel is entitled to bring out this evidence even in a case where the instruction would not be warranted—because there was corroborating evidence.

### III.

Turning to the efforts of defense counsel to introduce evidence of Roscoe's addiction, he requested that Roscoe bare his arms. On objection, the court said that the use of narcotics was not evidence of a crime. Defense counsel said fresh marks would impeach Roscoe's testimony that he had not used narcotics recently. The prosecutor said the jury was not qualified to make an inference from its own inspection of his arms. The request was denied.

Next day, trial counsel asked that the court appoint a physician to examine Roscoe's arms. The court said:

The only thing material about your request [is] whether this man is presently under the influence of narcotics. I think whether he may have needle marks in his arm is a collateral subject and I will deny your motion.

Defense counsel responded that he was not making the request to establish "the fact of his addiction, I accept your Honor's ruling on that yesterday." In other words defense counsel, being bound by the judge's prior ruling, that the fact that the informant was an addict was not material, could only make the proffer on a different theory, as showing a contradiction of testimony that impeached the witness. If the prior ruling was correct, this was indeed collateral. But in my view, the prior ruling was wrong. As Judge Bazelon points out, the fact that the informant was an addict is material because it shows his in-

---

being notoriously unreliable. The case was reversed on that ground. What is your proffer?

COUNSEL FOR KINNARD: My proffer is that we are not asking for an instruction on reliability. We are asking for his common experience on reliability.

THE COURT: If it is not admissible as an instruction, it is not admissible as evidence.

THE PROSECUTOR: This officer has not been qualified to give an opinion.

THE COURT: Maybe narcotic addicts are reliable and some are not reliable.

COUNSEL FOR KINNARD: I am not asking for an instruction on narcotic addicts or their reliability. I just want to put it as a fact for a jury to consider.

I am not sure but I think I have seen track marks up and down his arm.

THE PROSECUTOR: I doubt that. I havn't seen a thing.

THE COURT: I don't know whether he has them or doesn't. You haven't laid a foundation for this type of testimony.

COUNSEL FOR KINNARD: What foundation would you require? Do you want me to show that Roscoe is an addict?

THE COURT: Even if he were an addict the Court of Appeals has said it would be error to instruct the jury that an addict's testimony is unreliable simply because he is an addict.

COUNSEL FOR KINNARD: Then I am refrained [*sic*] from asking any further questions on this subject.

terest in providing information to the police even though it is false. This subject—of interest—is not at all collateral, and can indeed be brought out by extrinsic evidence.[9]

Defense counsel had already established his record of error by the trial judge, in his ruling that the status of Roscoe as an addict informant was not material, and in order to present that error he was not obliged to present evidence that Roscoe was an addict; indeed he might have been subjected to censure if he had persisted in the face of the prior ruling and tried to present evidence that the judge had held not material. And in view of the ruling that the evidence was not material, it was obviously not necessary to request an instruction—in a record now devoid of the informant's addiction—concerning the significance that the jury might properly attach to such addiction if only the judge had recognized the materiality of the informant's status as an addict.

## IV.

As Chief Judge Bazelon points out, there was no corroboration on the issue of entrapment. There is no reason for disagreeing with the ruling of the trial judge that there was an issue of entrapment, which defense was entitled to have the court put to the jury. There was not only the conceded threshold fact that a government agent was given funds to buy narcotics, *cf.* Hansford v. United States, 112 U.S.App.D.C. 359, 364, 303 F.2d 219, 224 (1962), but in addition the record includes the testimony of Roscoe at trial that Payne did not agree to make the sale on Roscoe's first request. The fact that Roscoe was an addict-in-

formant, if established, might well have led the jury to conclude that he lied in his subsequent testimony of Payne's readiness to make the sale.[10] This, in my view, provides an overall context in which Payne was entitled to make a showing that Roscoe was an addict as well as an informant, and of the significance of that fact, and would have been entitled to a special cautionary instruction on addict informants. These conclusions establish that it was error to make the rulings identified under II of this opinion.

ADAMS, Circuit Judge, dissenting:

The central issue in Payne's case is whether extrinsic evidence substantiating the impeachment of a prosecution witness must be admitted when defendants seek to establish an affirmative defense solely by the tactic of impeachment. Ancillary to this issue is the question whether it is error to exclude evidence regarding the reliability of addict informers generally where defendants are seeking a jury instruction as to the lack of credibility of a paid informant who is also a drug addict.

I am not insensitive to the dangers to the judicial process inherent in the use of addict informants. But because so much of the crime plaguing us today is attributable to narcotics, curbing the illegal drug trade is a primary problem facing our communities; in dealing with this problem, the use of informants is one of the most potent weapons in the public's arsenal. Accordingly, although courts must be alert to protect the accused against abuses engendered by the practice of utilizing informants, it would be inadvisable to tamper unduly

9. The judge also said that the request came late, and brought out that counsel for Kinnard had spoken to Roscoe the previous Sunday. But this fact would not inhibit questioning by counsel for Payne.

10. The central entrapment issue is whether the criminal design originated with the Government agent, and the disposition to commit the offense was implanted in the

mind of defendant, or whether the defendant was predisposed or ready to commit the offense and was merely afforded an opportunity by the Government agent to do so. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

with the system where the result would be to sacrifice the security of society without a correspondingly significant advance in the protection of individual rights and liberties. The safeguards inherent in the traditional rules of evidence adequately protect defendants by enabling them to impeach the credibility of informants, yet they do not so weigh the balance that the use of such evidence by the prosecution becomes impracticable.

The facts in this case are not substantially in dispute. Robert Roscoe, who was awaiting trial on burglary and narcotics charges, agreed to assist the Bureau of Narcotics and Dangerous Drugs (BNDD) as an informant. Roscoe named both defendants as participants in the drug trade. Two months later, Roscoe went to see defendant Payne on several occasions to arrange a sale of narcotics to Agent Jackson of the BNDD, who was posing as a friend from North Carolina. Payne agreed to sell Jackson an ounce of heroin for $400.

The three men met at Payne's residence and then left in Jackson's automobile and proceeded to a bowling alley, where they met defendant Kinnard. Kinnard informed Payne that the heroin would be available at the Cadillac Carryout, and that they should meet there. Because of the police in the vicinity, the men then drove to the Shrimp Boat Carryout, where they again met Kinnard. Kinnard gave a manila envelope containing a white powder, later found to be heroin, to Roscoe who in turn gave it to Jackson. After a brief discussion regarding who would be paid, Jackson gave $400 to Payne, who handed it to Kinnard. Kinnard and Payne then agreed to sell Jackson $500 worth of cocaine the following week. Defendants proceeded to leave the scene together. The entire transaction was observed at a distance by another BNDD agent, Cooper.

At trial, although each defendant attempted to interpose the defense of entrapment, neither testified. Rather, they endeavored to establish their theory by attacking the credibility of Roscoe, who testified that Payne was a willing participant in the sale. Roscoe was asked about his use of narcotics. He admitted using narcotics "approximately eight times" during the last two years, and as recently as a month prior to trial. The court then refused requests that Roscoe bare his arms or that his arms be examined by a dermatologist to determine whether the use had been more frequent or more recent than Roscoe had admitted. Agents Cooper and Jackson were questioned about governmental favors Roscoe received, but the court would not allow Jackson to testify as to the testimonial reliability of addict informers generally. The court charged the jury with the standard cautionary instruction on informers and entrapment. Counsel did not object to the charge as given.

Defendants contend that the trial court abused its discretion by limiting the cross-examination of Roscoe as described above. However, this Court has noted:

> "[I]f cross-examination of a witness has been extensive, repetitive and protracted, or if defense counsel has succeeded in bringing out several discreditable matters and further questions along this line would be merely cumulative, the trial judge might properly limit the scope of cross-examination without in any way harming defendants' case." United States v. Pugh, 141 U.S.App.D.C. 68, 70, 436 F.2d 222, 224 (1970).

Counsel for defendants, despite the limitation on cross-examination, were able to develop a considerable body of facts which would operate to impeach Roscoe's credibility. Specifically, they showed that after Roscoe agreed to cooperate with the BNDD, the serious charges against him were dropped and Roscoe was allowed to plead guilty to misdemeanors; that Roscoe was paid for information; that he was still on

probation; that he had lied in an identification hearing; that he had sold drugs; that he had used drugs as recently as a month prior to trial; and that he had a prior conviction for robbery.

The inquiry regarding Roscoe's arms was clearly collateral. It did not go *directly* to defendants' commission of the proscribed acts, their willingness to commit such acts, or to Roscoe's credibility. At most, it would go *indirectly* to Roscoe's credibility, by demonstrating that he had lied regarding the frequency of his use of narcotics. In such situations, the trial judge has rather broad discretion in limiting cross-examination. United States v. Pugh, 141 U.S.App.D.C. 68, 436 F.2d 222 (1970); Tinker v. United States, 135 U.S.App.D.C. 125, 417 F.2d 542, cert. denied, 396 U.S. 864, 90 S.Ct. 141, 24 L.Ed.2d 118 (1969); Howard v. United States, 128 U.S.App. D.C. 336, 389 F.2d 287 (1967). Generally, an inquiring party is precluded from offering extrinsic evidence to contradict a witness on collateral matters. Tinker v. United States, *supra*, 135 U.S.App.D. C. at 128 n. 16, 417 F.2d at 545 n. 16; Lee v. United States, 125 U.S.App.D.C. 126, 128, 368 F.2d 834, 837 (1966); 3 J. Wigmore, Evidence §§ 1000–1003 (3d ed. 1940).

The interpretation of needle marks on the arms of a narcotics user is not a matter within the common knowledge of a layman. Even if the trial judge had allowed Roscoe's arms to be exhibited to the jury, the jury could not have drawn any inference therefrom without resorting to conjecture. Therefore, the request that Roscoe show his arms was properly refused because the demonstrative evidence standing alone would not have been probative even as to the collateral issue of the frequency of his use of narcotics. To make such evidence probative, experts, such as the dermatologist, or other physician with appropriate clinical experience, requested by counsel, would have to interpret the marks on the skin for the jury. But if a doctor so testified for defendants, the prosecution would undoubtedly call a physician or other expert to offer counter-testimony regarding the extent of Roscoe's use of heroin, and a trial-within-in-a-trial, the very result the collateral impeachment rule is designed to prevent, would develop.

The purpose of impeaching Roscoe's testimony was not to negate the fact of defendants' participation in the sale, but rather was designed to create the inference that Roscoe had lied when he testified that Payne was predisposed to sell the drugs. Even if such inference could have been established by further impeachment, it would have allowed the jury only to disbelieve Roscoe's statement and not to consider it because it was untruthful. The record is barren of evidence to the effect that Payne and Kinnard were other than willing sellers. Thus, discrediting Roscoe still would not enable the jury to reach the rational conclusion that defendants were entrapped into committing the criminal acts with which they were charged.[1]

1. The theory advanced by Payne seems to be based on the following hypothesis: Although the jury evidently believed Roscoe with regard to Payne's being a willing seller despite the terrible damage done to his credibility, disputed evidence that Roscoe was an addict rather than user might have been crucial to the total destruction of Roscoe's credibility. After hearing such evidence and receiving the "paid-narcotics-addict-informer" instruction, the jury then might first have inferred that Roscoe lied about his use of drugs, and second, because Roscoe lied about the frequency of his own use of drugs, the jury might have believed he lied about Payne's willingness, and if he so lied, Payne must not have willingly sold the drugs. Accordingly, even though the circumstantial evidence indicated that Payne was a willing seller and there was no evidence to the contrary, on the basis of the double inference drawn from Roscoe's minimization of his drug use, the

Defendants also contend that the trial court committed error in not allowing cross-examination of Agent Jackson with regard to the unreliability of addict informers generally, and in refusing to give a cautionary instruction on the same subject to the jury. Counsel for defendants assert that it was not necessary to comply with the requirements of Rule 30, Federal Rules of Criminal Procedure, because to have done so would have been a futile act in view of the court's ruling restricting the cross-examination of Agent Jackson. However, it is significant that counsel requested the standard instruction regarding informants and at one point stated: "I am not asking for an instruction on narcotics addicts or their reliability \* \* \*."

Again, the purpose of the question asked of Jackson was to impeach Roscoe's credibility. However, since the only evidence indicated that Roscoe, the sole informant, was not an addict, testimony pertaining to the lack of reliability of addict informants would be clearly irrelevant and not probative as to any issue in the case; therefore, it was not error for the trial judge to exclude such evidence. Similarly, assuming that the issue of the adequacy of the instructions was properly preserved for appeal, the addict-informer instruction was properly withheld, since the factual basis for it —that Roscoe was an addict, as distinguished from a user—had not been established.

Some may be troubled by the advisability of fashioning a rule that would preclude the impeachment of informants in all situations. For example, cases may arise where defendants offer affirmative evidence on the issue of entrapment. However, I express no opinion whether collateral impeachment would be proper in such situations.

jury could rationally conclude that Payne's desire not to sell drugs was overborne by Roscoe's promises, threats, tricks or en-

treaties. To verbalize this hypothesis is to demonstrate its tenousness.