**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James M. McCOY et al., Defendants-Appellants.**

**No. 75–1641.**

United States Court of Appeals, Fifth Circuit.

Sept. 30, 1976.

---

1052

Thomas M. Haas, Mobile, Ala., for McCoy and McCoy.

Wilson M. Hawkins, Jr. (Court-appointed), Mobile, Ala., for Machefsky and Chastang.

Barry Hess, Mobile, Ala., for Vaughn.

James D. Brooks (Court-appointed), Mobile, Ala., for Bell.

Charles S. White-Spunner, U. S. Atty., Edward J. Vulevich, Jr., Wm. R. Favre, Jr., Asst. U. S. Attys., Mobile, Ala., for plaintiff-appellee.

Before WISDOM, GODBOLD and LIVELY,* Circuit Judges.

WISDOM, Circuit Judge:

The defendants-appellants, James McCoy, William McCoy, Maurice Machefsky, Henry Chastang, Cleo Vaughn, and Charles Bell were convicted on one or both of two counts for violations of 18 U.S.C. § 1955.[1] Count I charged the violation of the prohibition of

---

\* Of the Sixth Circuit, sitting by designation.

1. § 1955. *Prohibition of illegal gambling businesses*

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period of excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established. . . .

illegal gambling businesses; count II charged a conspiracy to violate § 1955, punishable under 18 U.S.C. § 371. The major question for review is whether there was sufficient evidence to sustain these convictions. We affirm the convictions with respect to each appellant but Bell.

The evidence showed that the appellants were bookmakers, or were working for bookmakers, in the Mobile, Alabama area. There were three bookmaking operations: one conducted by the McCoys and Chastang, one conducted by Bell, and one conducted by Vaughn.[2] The question focused on at the trial was whether the three bookmaking operations together constituted one gambling business, involving five or more persons, as specified by § 1955. The jury, by its verdict, answered this question affirmatively. Before addressing the issue of the sufficiency of the evidence, we resolve questions concerning the propriety of the government wiretaps, alleged error in an asserted comment by the prosecutor on the defendants' failures to testify, and the constitutionality of § 1955. We discuss also alleged errors in the use of expert testimony and in the trial court's jury instructions.[3]

## I.

The appellants contend that the district court erred in denying their pretrial motions to suppress evidence obtained through wiretaps of telephone conversations. They argue that the wiretaps violated provisions of Title III, Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 in three respects: (1) the authorization for the wiretap application was not properly made, (2) the affidavits supporting the

application did not contain a "full and clear statement", required by 18 U.S.C. § 2518(1)(c), that means of investigation, other than wiretapping, would be inadequate, and (3) the wiretap continued after the government's objectives had been achieved. We reject these arguments.

The statute requires that a wiretap application be authorized by the Attorney General or a specially designated Assistant Attorney General. 18 U.S.C. § 2516(1). Here, Robert Bork, the Acting Attorney General,[4] by an order dated October 23, 1973, specially designated Henry Petersen, the Assistant Attorney General of the Criminal Division of the Justice Department, to authorize such applications. In a letter of November 30, 1973 to the Chief of the Organized Crime and Racketeering Section, Criminal Division, Petersen authorized, by his own words, the wiretap application with which this case is concerned. James Featherstone, a Deputy Chief of the Section sent a copy of Petersen's letter to the United States Attorney, Charles White-Spunner, and White-Spunner submitted this copy to the judge who authorized the wiretap.

The appellants contend, first, that there is no showing that Petersen exercised his personal judgment in authorizing the wiretap. This argument is allegedly supported by the fact that Petersen's letter begins, "This is with regard to your recommendation that I authorize an application to a federal judge . . .". Petersen's personal judgment is certainly necessary. See *United States v. Giordano*, 1974, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341. The evidence adequately establishes that Petersen exercised such judgment. The quoted

---

**2.** There was evidence showing that Machefsky was in possession of football line sheets and more than $1,000 in cash when he was searched pursuant to a warrant. Moreover, taped telephone conversations show that he received betting information from the McCoy operation and that he placed bets with that operation. There was sufficient evidence, including the testimony of F.B.I. Agent Whitcomb, an expert witness, from which the jury could have concluded that Machefsky was a sub-agent of the McCoy bookmaking enterprise.

**3.** Our procedural holdings apply to Bell as well as to the others. These holdings may have relevance if the government attempts to retry Bell.

**4.** The Acting Attorney General has authority to exercise the 18 U.S.C. § 2516 responsibilities of the Attorney General. *United States v. McCoy*, 5 Cir. 1975, 515 F.2d 962, 963.

language relied upon by the appellants does not prove otherwise. It would be unrealistic to believe that the Assistant Attorney General would authorize or refuse to authorize wiretap applications without consulting his staff. That a recommendation to authorize an application was made by a subordinate does not mean that Petersen's personal judgment was not exercised.[5]

■ The appellants also complain that "[t]here is no testimony before the Court that shows that Mr. Petersen actually signed the application". In a number of reported cases Justice Department officials signed the names or initials of others. *See, e. g., United States v. Chavez,* 1974, 416 U.S. 562, 567, 94 S.Ct. 1849, 40 L.Ed.2d 380. The appellants failed even to contend there that the government was obligated to authenticate Petersen's signature by testimony or affidavit. This Court cannot give weight, therefore, to the appellants' suggestion that what appears to be Petersen's signature is bogus.[6]

The appellants argue that language in *United States v. Kerrigan,* 9 Cir. 1975, 514 F.2d 35, appeal pending, supports their proposition that the affidavits supporting the wiretap application were inadequate. The *Kerrigan* Court held that affidavits filed in that case complied with the requirement of 18 U.S.C. § 2518(1)(c) that an application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous". The Court observed, however, that the boilerplate recitation of the difficulties of gathering usable evidence in bookmaking prosecutions is not a sufficient basis for granting a wiretap order. To

hold otherwise would make § 2518(1)(c) and (3)(c) mere formalities in bookmaking cases.

514 F.2d at 38. The appellants maintain that the affidavits in this case are just those "boilerplate recitations" condemned in *Kerrigan.*

■ We observed in *United States v. Robertson,* 5 Cir. 1974, 504 F.2d 289, *cert. denied,* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778, that the statutory requirement "must be read in a common sense fashion". *Accord, United States v. Cacace,* 5 Cir. 1976, 529 F.2d 1167; *United States v. Armocida,* 3 Cir. 1975, 515 F.2d 29, 37, *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84; 1968 U.S.Code Cong. & Ad.News 2190 (S.Rep. 1097, section-by-section analysis of statute). Common sense dictates that the purpose of the statute "is not to foreclose electronic surveillance until every other imaginable method of investigation had been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques". *United States v. Pacheco,* 5 Cir. 1974, 489 F.2d 554, 565; *see United States v. Smith,* 9 Cir. 1975, 519 F.2d 516, 518. In order to uphold the wiretap order, all that need be found in the affidavit is a "factual predicate". *Armocida,* 515 F.2d at 38. That factual predicate exists in this case in the affidavit of F.B.I. Special Agent Flynn.

Flynn's affidavit stated that he had five years experience investigating gambling and other racketeering offenses in the Mobile, Alabama area. Based on this experience, he concluded that legalized searches of gamblers and their establishments have failed to prove all the elements of federal offenses, particularly with respect to participants not at the searched premises at the

---

5. It is of no importance that Petersen authorized the wiretap application in a letter not addressed to the United States Attorney. The authorization was clearly intended to reach the United States Attorney and it did reach him. The manner in which the authorizing officer transmits notice of authorization to the attorney filing the application is not controlled by statute.

6. See also 18 U.S.C. § 2518(10)(a), which provides that a motion to suppress unlawfully intercepted communications should be made before trial "unless there was no opportunity to make such motion or the person [seeking to suppress] was not aware of the grounds of the motion", and *United States v. Sisca,* S.D.N.Y. 1973, 361 F.Supp. 735, 738–41, *aff'd,* 2 Cir. 1974, 503 F.2d 1337, 1346–49, *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283.

time of the search. Furthermore, the affidavit stated that gamblers do not keep permanent records and that temporary records are destroyed before or during a search. In addition, the affidavit states that such records are often in code and have proved difficult to interpret. The affidavit related that the F.B.I. informants would be unwilling to testify and that no witness was known who could testify concerning the full extent of the suspected gambling business. Finally, the affidavit declared that continued close physical surveillance of a billiard parlor believed to be a center for gambling transactions might expose the investigation and jeopardize the outcome of the investigation.

The Flynn affidavit is an adequate factual predicate to support the judge's finding that "other investigative procedures . . . appear unlikely to succeed". This affidavit appears no less "full and complete" than the affidavits approved in *Armocida,* and *United States v. Schaefer,* 8 Cir. 1975, 510 F.2d 1307, 1310, *cert. denied,* 421 U.S. 975, 978, 95 S.Ct. 1975, 1980, 44 L.Ed.2d 466, 470. To be sure, additional facts were included in affidavits approved in *Kerrigan* (that the "front office" was protected by a fence, barbed wire, and patrolling dogs) and *Robertson* (that undercover operations would be difficult because of the lack of black federal agents), but in neither case did the court state that such additional facts were essential. Notwithstanding the fears expressed in *Kerrigan,* the possibility that wiretaps may almost always be approved in similar bookmaking cases does not make "formalities" of §§ 2518(1)(c) and (3)(c). The application must still contain the "full and complete statement". The decision whether to order a wiretap is then to be made by the district court exercising its discretion. *See Smith,* 519 F.2d at 518. That court, in an effort to make the § 2518(3)(c) finding, "may require the applicant to furnish additional testimony or documentary evidence in support of the application". 18 U.S.C. § 2518(2). In the absence of additional

evidence a wiretap order might well be denied. We do not, therefore, judicially abrogate §§ 2518(1)(c) and (3)(c) with respect to § 1955 investigations. We simply hold that the district court's discretion was exercised here upon sufficient factual representations.

Finally, the appellants argue that the wiretaps continued well after the F.B.I. agents had gathered sufficient evidence of a federal gambling violation. They urge, therefore, that the wiretap violated the requirement of 18 U.S.C. § 2518(5) that "[n]o order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization". *See, e. g., United States v. Cafero,* 5 Cir. 1973, 473 F.2d 489, 496, *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223.

▇▇▇ There has been no showing by the appellants that the wiretap continued after the F.B.I. had achieved the proper objectives of the authorization. *See, e. g., United States v. Lanza,* M.D.Fla.1972, 349 F.Supp. 929, 933–34. One of those objectives was to obtain information that could be used to convict the appellants of federal gambling law violations. Specifically, the government had to prove that there was a gambling business in Mobile meeting the five-person jurisdictional requirement of § 1955. The wiretaps were necessary because of the allegedly widespread and complex nature of the Mobile bookmaking business. This is, then, not a situation in which the government needed but one intercepted conversation to make its case. The evidence shows that most of the intercepted conversations contained mere fragments of information and that such information could be combined into a credible § 1955 prosecution only with the aid of an expert. It was proper, therefore, for the F.B.I. to have continued the wiretap for the full 15 days specified in the wiretap order.[7]

---

7. Bell also apparently contends that the wiretaps were illegal because the inventories served on the objects of the wiretap stated that the

taps ended on December 14, whereas in fact the taps were terminated on December 15 in accordance with the wiretap order. The inven-

## II.

The appellants contend that reversible error was committed by the prosecuting attorney when he allegedly commented on the defendants' failures to testify. The comment occurred during the government's examination of an F.B.I. agent. The agent was identifying the voices of taped conversations that were being played to the jury. One call was identified as a call from the defendant Bob Yanen to Bell. After that call was played, the agent identified the next call as one between Vaughn and another defendant, Abb Ingram. Before this call could be played, Yanen's attorney interposed a remark to which the allegedly prejudicial comment was a response:

> Mr. Brooks: Judge, on that last call, I think there was a mistake in the transcription of that last call. That last call was not from Bob Yanen to Charlie Bell as was stated in the transcription. The Court may need to go back to the girl who typed it wrong. From Bob C-o-w-e-n, and I think we can try to prove it if we can go back over it and check with both defendants.
>
> Mr. Favre: Wait a minute, the defendant will—The only way the defendant can testify in this case—

The defendants moved for a mistrial and for curative instructions at this point. The mistrial was denied, but the trial court cautioned the jury immediately that the presumption of innocence runs with the defendants throughout the trial and that there is no compulsion, requirement, or burden on a defendant to testify. In addition, the court warned the jury not to pay any attention "to all the back play between the attorneys". Later in the trial, the court instructed the jury that no adverse inferences could be drawn from a defendant's failure to testify.

A prosecutor's remark constitutes impermissible comment on a defendant's failure to take the stand when the remark is manifestly intended or would naturally and necessarily be understood by the jury as such a comment. *United States v. Wilson*, 5 Cir. 1974, 500 F.2d 715, 722, cert. *denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658; *United States v. White*, 5 Cir. 1971, 444 F.2d 1274, 1278, cert. denied, 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266; *Samuels v. United States*, 5 Cir. 1968, 398 F.2d 964, 967, cert. denied, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566. For example, when a prosecutor argued to the jury that "You didn't hear from the culprit," the prejudicial tendency of that argument required reversal. *See United States v. Bates*, 5 Cir. 1975, 512 F.2d 56. In all cases, however, the reviewing court must look to the context in which the statement was made. *Samuels*, 398 F.2d at 967.

Here, the context demonstrates that there was no error. The prosecutor's comment was not addressed to the jury, but to the trial court. The defendant most likely to be thought by the jury as the object of the comment—Yanen—was not convicted, nor could the comment have prejudiced Bell, whose conviction we reverse. The comment was directed at a procedural problem, the means of identifying one party to a phone call, unrelated to the guilt or innocence of any of the appellants. Finally, the comment was made during the government's case in chief, before the defendants had exercised their option not to testify. All that appears is a comment "unexceptional and wholly lacking in aggravation and emphasis". *Id.* at 969.

tories are required by 18 U.S.C. § 2518(8)(d)(2), (3) to include notice of "the period of authorized . . . interception" and the "fact that during the period wire . . . communications were or were not intercepted". The misstatement in the inventory was a technical violation of the statute. This does not mean, however, that the wiretap communications should have been suppressed. The error came to light at the suppression hearing and the appellants had notice of the actual length of the wiretap

two months prior to trial. No prejudice to the interests of the appellants has been alleged or is apparent from the record and in such a situation the use of the intercepted communications does not violate the statute. See *United States v. Rizzo*, 2 Cir. 1974, 492 F.2d 443, 447, cert. denied, 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665; *United States v. Manfredi*, 2 Cir. 1973, 488 F.2d 588, 601–02, cert. denied, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240.

Even if there was some impropriety in the prosecutor's remarks, it was sufficiently corrected by the court's curative instructions. The appellants argue, citing *United States v. Smith*, 6 Cir. 1974, 500 F.2d 293, that the court's failure to instruct the jury at the time of the comment that the defendants' failure to testify can give rise to no adverse inferences requires reversal. *Smith*, however, was a case in which the prosecution's closing argument told the jury to "require" the defendants to present a "reasonable explanation" of taped wiretap evidence. The remarks in this case, if they were interpreted improperly at all, are not nearly as egregious as the remarks in *Smith*. The remedy in all cases should fit the problem. The court's instruction that there was no "burden" on a defendant to testify comes fairly close to the instruction argued by the appellants to be necessary. Here, a stronger curative instruction might have gone too far, by suggesting to the jury that the comment might have been interpreted as drawing certain adverse inferences. We are not prepared to require the strongest curative instructions in cases where, as here, the prosecutor's remark is unlikely to have had any prejudicial effect.

### III.

■ The appellants urge that 18 U.S.C. § 1955 is void for vagueness. The gist of this contention is that it is not possible for a bookmaker to know when his transactions with other bookmakers will be deemed to fall within the ambit of this statute. *See, e. g., Connally v. General Construction Co.,* 1926, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322.

We agree that the contours of federal jurisdiction under § 1955 have not yet been fully delineated. The statute is sufficiently explicit, however, to afford a fair warning to a bookmaker contemplating conducting any type of business transaction with another bookmaker. Any surprise on the part of the appellants at the application of § 1955 to such transactions is disingenuous.[8] Moreover, the acts performed by violators of § 1955 are necessarily proscribed by state law.[9] Such violators cannot complain, therefore, of being lulled by the generality of § 1955 into a false sense of security that their behavior stood outside the ambit of criminal prosecution.

The courts of appeals of four other circuits have rejected general vagueness attacks on § 1955. *See United States v. Sacco*, 9 Cir. 1974, 491 F.2d 995, 1003 (en banc); *United States v. Thomas*, 8 Cir. 1975, 508 F.2d 1200, 1203; *United States v. Mattucci*, 6 Cir. 1974, 502 F.2d 883, 890 (by implication); *United States v. Riehl*, 3 Cir. 1972, 460 F.2d 454, 459. *See also United States v. Hawes*, 5 Cir. 1976, 529 F.2d 472, 478; *United States v. Marchman*, E.D.Tenn. 1975, 399 F.Supp. 585, 586; *United States v. Bally Manufacturing Co.*, E.D.La.1972, 345 F.Supp. 410, 425. We too rule that § 1955 is not void for vagueness.[10]

8. This case is not one, for example, where it is necessary to create an "insulating buffer zone of added protection at the peripheries of . . . Bill of Rights freedoms". Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U.Penn.L.Rev. 67, 75 (1960). Nor is it a case in which the "legislative authority [has attempted] to pass to the courts . . . the awesome task of making case by case . . . the criminal . . . law". *Id.* at 81. Finally, we suggest that it would not have been possible or practical for Congress to outline each of the many possible ways that a person might be said to conduct a gambling business. We note that, in another context, the Supreme Court has characterized § 1955 as a "carefully crafted piece of legislation". *See Iannelli v. United States*, 1975, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616, 629. It is appropriate to

recall, therefore, that the maintenance of order is the precondition of any freedom in a society, and where the subject matter of regulation is such as to make infeasible modes of law administration other than those which involve *ad hoc* judgments, considerable pressures are created in favor of permitting an *ad hoc* judgment scheme. Note, *supra*, at 95.

9. See note 1 *supra*.

10. Related to the vagueness doctrine is the principle that criminal statutes are to be strictly construed. See, e. g., *United States v. Insco*, 5 Cir. 1974, 496 F.2d 204, 208–09. We have applied this principle in construing § 1955 to require the participation of the five persons for the thirty day jurisdictional period. See *United States v. Bridges*, 5 Cir. 1974, 493 F.2d 918,

## IV.

The appellants admit that the evidence showed there were three bookmaking operations in the Mobile area. The jury could easily have found that such bookmaking activities violated Alabama law.[11] Moreover, there was evidence that the McCoy bookmaking operation had a gross revenue of $2,000 in a single day. The only issue about the adequacy of the evidence is whether there was evidence showing an illegal gambling business involving "five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business". 18 U.S.C. § 1955(b)(1)(ii).

At the outset, it is necessary to explain briefly how this bookmaking operation works. Before we do so, however, it should be made clear that this brief exposition on the nature of the bookmaking business is not one that was squarely put in evidence before the jury. Nevertheless, it is one that describes a reasonable inference the jury could have drawn from the evidence in the case. The government is entitled to all reasonable inferences favorable to its position. *Glasser v. United States*, 1941, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; *Hawes*, 529 F.2d at 482. *Glasser*, of course, "does not require complete judicial abdication to the determination of the trier of fact", *In re Joyce*, 5 Cir. 1974, 506 F.2d 373, 376, *quoting United States v. Ferg*, 5 Cir. 1974, 504 F.2d 914, 916. "If a conclusion that all hypotheses of innocence have been excluded by the evidence could be reached only as a result of speculation or assumptions about matters not in evidence, then the jury verdict must be overturned". *United States v. Box*, 5 Cir. 1976, 530 F.2d 1258, 1267.

We use football betting, involved in this case, to illustrate our explanation.[12] The bookmaker sets a "line" on a game, the conditions under which the bookmaker is willing to bet with a bettor on either side of that game. For example, the bookmaker may establish the New Orleans Saints as 7 point favorites (an unlikely assumption, some might say) over the Los Angeles Rams. A bettor may place a $10 bet on New Orleans. If New Orleans wins by more than 7 points, the bettor wins $10. If New Orleans wins by less than 7 points or does not win, the bettor loses $11. This extra $1 is the bookmaker's commission. Or, the odds might be six to five and "take your choice". In ideal conditions, the bookmaker would have an equal amount bet on each side of the game. He would then pay the winners with the losers' money and collect the commission from the losers as profit.

The setting of the correct line is crucial to a bookmaker's continued success. If the bookmaker sets a line too far removed from the expectations and predictions of his customers, he is likely to get too much action on one side of the line and very little on the other. Although this could work to the bookmaker's benefit if he wins, the risk of loss is great. When a bookmaker gets too much action on one side, he tries to "lay off" the excess action by betting on the team favored by his customers. This is, in effect, redirecting the customers' bets to a bookmaker who can use action on that side of the line or to any other gambler interested in taking the good side of 11 to 10 or 6 to 5 odds. If, however, the bookmaker's line is set badly, he may find it difficult to lay off a sufficient number of bets to prevent the risk of loss.

It is important to all bookmakers that each in a relevant market set a line close to

---

922–23. This principle does not require us to hold that the exchange of line information alone, see IV. *infra*, is insufficient to show that a person was conducting a gambling business within § 1955. Strict construction of § 1955 along those lines would greatly offset its ability to reach the kind of conduct Congress sought to inhibit. A criminal statute, like any other statute, "should . . . be read with a saving grace of common sense". *United States v.*

*Mikelberg*, 5 Cir. 1975, 517 F.2d 246, 252, *quoting Bell v. United States*, 1955, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905.

11. Bell's argument to the contrary is specious.

12. For other descriptions of the football gambling business, see *United States v. Box*, 5 Cir. 1976, 530 F.2d 1258, 1261, and sources cited at nn. 3, 6.

all the other lines. If a particular book-maker should give the Rams 7 points when all other bookmakers in the area give the Rams 5 points, all rational and informed bettors will bet with the particular book-maker who was out of line, and all Saints bettors will bet with the others. Indeed, the same bettor may bet with both book-makers, on opposite sides, in a process called "middling" or "over and under" bet-ting. This is a form of arbitrage. The effect of middling would be to play off one bookmaker against another with little risk and a likelihood of gain for the bettor.[13] Although this situation is theoretically re-mediable by laying off, that process might not work in particular circumstances. In any event, such a situation is bound to create confusion. It is conducive to the smooth operation of bookmaking in an area, then, to establish and maintain a line from which bookmakers vary but little.[14]

Turning to the law of § 1955, we find that the most recent Fifth Circuit interpre-tation of the statute is *United States v. Box, supra.* There, we held that the statute could not be used against a non-bookmak-ing gambler who accepted occasional lay-off bets from bookmakers. The gist of our opinion was that "the statute was meant to exclude bettors", 530 F.2d at 1267, and that there was insufficient evidence to exclude as a reasonable hypothesis that Box was merely a bettor. Although we reviewed some combinations of evidence that would suffice under § 1955, we did not attempt to outline a general rule governing that stat-ute.

■ Such a rule was stated, however, in *United States v. Joseph*, 5 Cir. 1975, 519 F.2d 1068, 1071, quoted in *Box*, 530 F.2d at 1267 n. 28. There, we declared that "[a] person who performs *a necessary function* other than as a mere customer or bettor in the operation of illegal gambling 'conducts an illegal gambling business'". (Emphasis added.) We also stated that the intent of

Congress was to include all those who par-ticipate in the operation of a gambling busi-ness, regardless [of] how minor their roles. *Id., citing United States v. McHale*, 7 Cir. 1974, 495 F.2d 15, 18; *Hawes*, 529 F.2d at 482. We upheld the convictions of Joseph and two others like him, observing that they "helped the [main] . . . book-makers by providing them with line and other gambling information". *Id.* Al-though evidence of lay-offs was also relied upon by *Joseph*, we did not say that such evidence was necessary. The cases constru-ing § 1955 are uniform in declaring that Congress intended even for "street level employees" to be includable in the jurisdic-tional five. *See Box*, 530 F.2d at 1264; *United States v. Marrifield*, 5 Cir. 1975, 515 F.2d 877, 880; *United States v. Tarter*, 6 Cir. 1975, 522 F.2d 520, 526; *United States v. Sacco*, 9 Cir. 1974, 491 F.2d 995 (en banc); *United States v. Becker*, 2 Cir. 1972, 461 F.2d 230, 232; *United States v. Jones*, 9 Cir. 1974, 491 F.2d 1382, 1384.

■ The conclusion we reach from con-sideration of *Joseph* and the other § 1955 cases is that a person who performs a func-tion necessary in the operation of a gam-bling enterprise makes the person so per-forming, unless he is merely a customer or bettor, one of the jurisdictional five. Con-victions should be upheld when based on the exchange of line information and the laying off of bets, when the evidence supports a conclusion that such activity is reasonably necessary to a gambling enterprise. *See United States v. Schaefer*, 8 Cir. 1975, 510 F.2d 1307, 1311–13, cert. denied, 421 U.S. 975, 978, 95 S.Ct. 1975, 1980, 44 L.Ed.2d 466, 470.

■ Returning to the facts of this case, we know that the McCoys and Chastang were part of the same bookmaking opera-tion. When Machefsky, a sub-agent, is counted in this enterprise, there is no doubt that there are four persons to be counted in the jurisdictional requirement. See note 1.

---

**13.** In fact, there was testimony from one bettor that he would try to bet that way if there were a big enough spread between the lines of differ-ent bookmakers in Mobile.

**14.** *United States v. Box*, 530 F.2d at 1261 n.5 (by implication).

Cleo Vaughn ran an independent bookmaking operation. There was expert testimony, however, that Vaughn accepted lay-off bets from the McCoy operation. Although a bet by a bookmaker with another bookmaker need not be a lay-off,[15] the jury could have believed that Vaughn did accept lay-offs and that such lay-offs were reasonably necessary to the McCoy business. As we said recently in *Box*, 530 F.2d at 1266, evidence that an "individual was conducting his own illegal gambling [business] and was regularly exchanging lay off bets with the other bookmakers" can support a § 1955 conviction.[16] The testimony showed that Vaughn set half-time lines (popular in Mobile) and transmitted them to the McCoy operation. This testimony weakens Vaughn's contention that there was inadequate evidence for conviction. The jury could reasonably conclude that Vaughn was properly counted with the McCoy operation and constituted the "fifth person". Thus, the convictions of Vaughn, the McCoys, Chastang, and Machefsky comported with the jurisdictional requirements of the statute.

A difficult question, however, is whether the appellant Bell was sufficiently connected to the McCoy bookmaking operation to be considered as one of its members. Whitcomb could not testify that Bell had made or accepted any lay-offs with any of the other bookmakers. There was ample evidence that Bell discussed line information with the McCoy operation and that he received line information from Vaughn. Indeed, the exchange of line information was characterized by Whitcomb, on cross-examination, as collaboration on setting the line.

The first question, not previously addressed by the federal appellate courts, is whether the exchange of line information alone can suffice to show that one bookmaker is participating in the operation of another bookmaker. We cannot exclude this possibility for we have already shown that the exchange of line information may be reasonably necessary to the well-being of all bookmakers in a locality.[17] But whether there was enough evidence here to allow the jury to conclude, from *Bell's* communications regarding the line, that *Bell* was guilty is another question requiring additional analysis.

We begin with the common sense observation that not everyone who receives from or transmits line information to a bookmaker is guilty of a § 1955 violation. A newspaper, for example, might innocently report a line being used by Las Vegas gamblers. A bettor might casually report to one bookmaker what line is being offered by another. And it would be unheard of for a mere bettor, to place a bet, exempt from § 1955 prosecution, without first receiving the line.

Bell, to be sure, was no "mere bettor". It is clear from the evidence that he was a bookmaker of some size in the Mobile area. It is plausible, therefore, that the McCoy operation needed or wanted Bell to comply with the McCoy line in order to protect or enhance the McCoy risk-minimizing function. But is there evidence that Bell received line information to such an extent that this behavior substantially affected McCoy's business? If not, the convictions cannot be sustained.

---

**15.** See *United States v. Thomas*, 8 Cir. 1975, 508 F.2d 1200, 1202 n.2; F.B.I. Agent Whitcomb also testified to this effect.

**16.** In *United States v. Schaefer*, 8 Cir. 1975, 510 F.2d 1307, 1311, *cert. denied*, 421 U.S. 975, 978, 95 S.Ct. 1975, 1980, 44 L.Ed.2d 466, 470, the Court states that "layoff betting is the major link connecting independent operations into an effective gambling organization that will work profitably and well for all concerned".

**17.** We reject the appellants' argument that the jury instructions, which included a reference to

the exchange of line information as constituting one means by which separate bookmakers could be found to conduct "one gambling business", was too broad. The instruction fairly stated the law. There was no undue emphasis placed on line information in the charge. There was substantial evidence implicating Vaughn in the McCoy operation, including setting the half-time line and accepting layoff bets. The charge given the jury in this case is not as broad, finally, as the charge upheld in *United States v. Thomas, supra.*

At most, the evidence against Bell is Whitcomb's testimony that Bell "collaborated" with McCoy in setting the line. "Collaboration" means "working together", connotes a common purpose, and suggests that Bell was important enough to McCoy's operation for McCoy to treat him more or less as an equal in the bookmaking business. Outside of that evidence, however, the only Bell/McCoy direct connections in evidence are four conversations between Bell and McCoy or one of his cohorts concerning the line. There is no evidence showing the importance of such conversations to McCoy, or showing a "*constant* exchange of line information", *Box*, 530 F.2d at 1261. (Emphasis added.) The evidence merely shows that Bell four times set a line after finding out what McCoy's line was. This is insignificant in comparison to the number of lines McCoy set during the period of investigation and simply could not demonstrate to a reasonable juror that Bell was a part of McCoy's business. Nor does the fact that Bell and McCoy both used half-time lines furnished by Vaughn supply the necessary connection between Bell and McCoy in the absence of evidence indicating that Bell's receipt of this information was necessary to McCoy's business.

Bell was not shown to have regularly accepted and used McCoy's line information, nor is there any evidence suggesting that Bell would regularly accede to McCoy's line when given that information. A bookmaker who occasionally uses the line of another bookmaker is no more conducting the other's business than a grocer who happens to charge nineteen cents for a bunch of radishes upon seeing another grocer charge the same amount. Cf. *United States v. Thomas*, 508 F.2d at 1206.[18] If the

competitors can be said to have fixed prices—shared a significant amount of line information—that alone may justify a conviction, but that is another case. Bell's convictions must be overturned for lack of sufficient evidence.

### V.

Vaughn objects to the testimony of F.B.I. special agent Whitcomb, the government's expert on bookmaking and the principal government witness. Whitcomb testified that one conversation between Vaughn and William McCoy was a lay-off. He could not show from the records, however, that the particular lay-off was in fact necessitated by McCoy having too much action on one side of a game. Vaughn contends that "[i]t is obvious that this witness is calling all bets between the defendants layoff rather than simple bets, so that he may support his 'one business theory".

 It was not error for the district court to allow Whitcomb to testify about lay-offs as he did. Whitcomb had listened to all of the intercepted communications at least once and had much experience in the bookmaking business. He was, in particular, able to analyze these conversations in a way that the average juror or layman could not.[19] Vaughn's objections to this testimony were jury arguments and went to the weight that the jury should have accorded his testimony. Those same objections are inadequate to overturn the jury's verdict.

The appellants' other objection to the use of expert testimony is similarly unpersuasive. Error is alleged because Whitcomb testified as to "ultimate facts"—e. g., that certain transactions were lay-offs.

---

18. We note that in *United States v. Scasino*, 5 Cir. 1975, 513 F.2d 47, 50, we characterized a similar affiliation of bookmakers as "two independent operations sharing a miniscule bit of information". Although this characterization was in the context of a determination that one of the operations did not have standing to challenge an illegal wiretap on the other operation, see 18 U.S.C. § 2518(10)(a) and § 2510(11), it does support to some extent our conclusion here.

19. We note that the use of expert testimony in proving gambling offenses has been approved by many courts. See *United States v. Smith*, 9 Cir. 1975, 519 F.2d 516, 520–21; *United States v. Cafero*, 3 Cir. 1973, 473 F.2d 489, 503; *cases cited in* 3 Wharton's Criminal Evidence § 615 (13th ed. 1973).

■ Although we have, on occasion, frowned upon the practice of asking an expert to give his conclusions as to the entire case (*see United States v. Ragano*, 5 Cir. 1973, 476 F.2d 410, 416–17) admissibility of an expert's conclusion depends on the nature of the issue and the circumstances of the case, and involves a large element of judicial discretion. *Hamilton v. United States*, 5 Cir. 1934, 73 F.2d 357, 358–59.

■ Here, in characterizing certain transactions as lay-offs, the expert was correctly drawing "inferences from the facts which a jury would not be competent to draw". McCormick, Evidence § 13 (1954). It is questionable that these conclusions concerned an "ultimate issue". Even if they did, that does not require their exclusion. *Hamilton, supra.* The testimony challenged here is not unlike that referred to in upholding § 1955 convictions in *United States v. Bohn*, 8 Cir. 1975, 508 F.2d 1145, 1149–50, *cert. denied*, 421 U.S. 947, 95 S.Ct. 1676. *See also* Fed.Rule Evid. 704.

### VI.

The appellants contend that certain portions of the trial court's charge to the jury each constitute reversible error. The first objection pertains to that part of the court's instructions in which the jury was told that "the conduct which the law proscribes, that is, the conduct which the Congress finds illegal, is the bookmaking business". The appellants argue that the statute proscribes, not "the bookmaking business", but the *conduct* of a bookmaking business. Moreover, the court instructed the jury that it should find guilty those defendants who had "engaged" in that illegal business, provided the jurisdictional requirements, *e. g.*, five or more persons, were met. The word "engage" is said to sweep broader than the word "conduct", which is actually used in § 1955.

■ Any analysis of these alleged errors must begin with noting that each statement made by a judge to the jury should be examined in light of the entire charge and that isolated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial. *United States v. Musgrave*, 5 Cir. 1975, 483 F.2d 327, 335, *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315. Looking at the whole charge, we hold that the instructions with respect to § 1955 do not require reversal. ·The objection that the congressional intent was to make the bookmaking business illegal is specious in light of the ·other instructions making it clear that the only businesses proscribed were those conducted by five or more persons. Similarly, the jury was made aware that mere customers or bettors did not come within the statutory definition of those who might be found conducting an illegal gambling business. Although "engage" may for some purposes encompass more than "conduct", the latter term, for the purposes of § 1955, is broad enough so that use of the word "engage" could not have been prejudicial.

■ The trial court's instructions on conspiracy are objected to on the ground that they failed to contain a list of the specific elements of the crime of conspiracy. Apparently, this contention boils down to an objection to the fact that, in the conspiracy section of the charge, the trial judge did not repeat his detailed instructions concerning the nature of the substantive offense. The appellants rely on *United States v. Massiah*, 2 Cir. 1962, 307 F.2d 62, *rev'd on other grounds*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. That case is easily distinguishable. There, the reversible error was the trial court's failure to instruct the jury that, in order to find a conspiracy under 21 U.S.C. § 174,[20] the conspirators had to have knowledge that the drugs being distributed

---

**20.** 21 U.S.C. § 174 reads, in pertinent part: Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment or sale of such nar-

cotic drug after importation, *knowing the same to have been imported illegally*, or conspires to commit any such action in violation of the laws of the United States, shall be punished. (Emphasis added.)

were illegally imported. Such knowledge, however, was explicitly required by § 174. Here, the appellants were charged with a violation of 18 U.S.C. § 371, which does not contain any specific additional elements other than those which the trial court outlined in its charge.[21] *Massiah* has been distinguished before by similar reasoning, *see Musgrave*, 483 F.2d at 336–37; *United States v. Agueci*, 2 Cir. 1962, 310 F.2d 817, 825, and, in short, does not apply to the facts here.

■■■■■ Finally, the appellants contend that the district court incorrectly instructed the jury on the nature of "aiding and abetting" in the commission of a crime, a violation of 18 U.S.C. § 2 that makes the aidor or abettor liable as a principal. The alleged error is the failure to instruct the jury that, in order for it to find a defendant liable as an aidor or abettor, it must first find that the substantive offense has been committed without regard to § 2. It is true that the existence of the crime is an element of the offense of aiding and abetting. *See, e. g., United States v. Barfield*, 5 Cir. 1971, 447 F.2d 85, 89. The district court's instructions, while not specifically spelling out this requirement, could only have been interpreted as requiring a finding of the existence of the crime. The court told the jury that

> every person . . . who voluntarily cooperates with, or aids, or assists, or

advises, or encourages another in the commission of a crime, is an accomplice, without regard to the degree of his guilt. An accomplice is defined as being one concerned with others in the commission of the crime.

. . . . .

> Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or produces its commission, is punishable as a principal.

It is clear that the word "crime", as used here, referred to a committed crime, not a crime that was intended, perhaps, but never came off. Although it would have been preferable for the trial court to give the requested instruction, the instruction given sufficiently described the crime of aiding and abetting. Moreover, we note that, in order for any of the appellants to have been prejudiced by an erroneous instruction, all of them would have had to have been found guilty by the jury by virtue of § 2. Otherwise, at least one of the appellants was found to have violated § 1955 without regard to § 2, and the requirement that the crime have been committed was fulfilled. The extreme unlikeliness that all the defendants were found guilty for aiding and abetting each other, yet none were found guilty for actually committing the § 1955 offense, eliminates almost entirely the possibility of prejudice from an erroneous charge.[22]

---

**21.** 18 U.S.C. § 371 provides primarily that

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**22.** The appellants urge error in the court's decision to continue the trial with respect to eight defendants after the court had granted motions of acquittal as to nine defendants. Fed.R. Crim.P. 29(a) allows a trial court to grant such motions, and the usefulness of this procedure would be unduly diminished if a trial court were faced with a choice of acquitting all or none. It is argued, however, that the court's action could easily have indicated to the jury that the remaining defendants were guilty. In

*United States v. Campbell*, 9 Cir. 1974, 507 F.2d 955, a similar argument was rejected, in part because the defendant did not request an instruction to the effect that "no implication with respect to [his] guilt was intended in granting the co-defendant's motion for acquittal". *Id.* at 958. Although such a request was made here, the giving of such an instruction in mid-trial should be left to the discretion of the trial court, and no abuse of discretion has been shown. Similarly, it was not improper for the court to prohibit Bell's counsel from commenting on the fact that the only connection between Bell and the remaining defendants had been the exchange of line information. In view of our reversal for lack of sufficient evidence, we do not comment on Bell's argument that the district court erred in failing to sever his case from that of the others.

## VII.

In conclusion, the judgments of conviction with respect to James McCoy, William McCoy, Maurice Machefsky, Henry Chastang, and Cleo Vaughn are affirmed. The judgments of conviction with respect to Charles Bell are reversed. It is within the discretion of this Court either to order the charges against Bell dismissed or to remand for a new trial, if the government desires to continue its prosecution of Bell. We choose to remand the case against Bell in light of our discussion of the evidentiary issues and our desire to be fair to the government as well as the appellant.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.