UNITED STATES of America, Appellee,

v.

Anthony ROSA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Lawrence SKELTON, Defendant, Appellant.

Nos. 82–1497, 82–1513.

United States Court of Appeals, First Circuit.

Argued Jan. 31, 1983.

Decided April 11, 1983.

Willie J. Davis, Boston, Mass., for Anthony Rosa.

Matthew H. Feinberg, with whom Harry C. Mezer, Boston, Mass., was on brief, for Lawrence Skelton.

Paul F. Healy, Jr., Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before ALDRICH, BOWNES and BREYER, Circuit Judges.

PER CURIAM.

Appellants Anthony Rosa and Lawrence Skelton and another co-defendant were convicted on all counts of a three-count indictment and sentenced to two years imprisonment—six months to be served and the balance to be suspended with probation. The indictment had charged the defendants with violations of 18 U.S.C. §§ 371, 659, 2315, and 2 for conspiring to receive, possess, and dispose of stolen Polaroid film and for aiding and abetting these crimes. In appealing their convictions the appellants individually and jointly allege that errors meriting reversal were committed during their joint jury trial in the district court. Our review leads us to conclude that their convictions should stand.

We have gleaned the pertinent facts from the trial transcript. On March 28, 1980, a tractor-trailer truck loaded with film and traveling from the Polaroid plant in Needham, Massachusetts, to California was hijacked in Connecticut. About two weeks earlier Donald Smoot met with Thomas Lane and Henry Gonsalves and told them that Edwin Mason had lined up a Polaroid truck to be hijacked. They ultimately agreed to a plan under which Mason would steal the truck, Lane would arrange for selling the film, Gonsalves would assist both Lane and Mason, and Smoot would provide protection.

After the initial meeting Lane discussed arrangements to sell the stolen film with Anthony Rosa, a Woburn, Massachusetts, police officer who Lane had known for four years. Rosa offered to speak with Anthony Cerullo, a Woburn store operator who might be interested in purchasing the film. Ten days before the hijacking Lane and Rosa met with Cerullo, who expressed interest in purchasing the film.

Several days later Lane told Rosa that the truck would be taken to Lane's rented house in Woburn. Rosa said he would watch out for the hijackers and try to get the other police officers on duty to go to another section of town. He also agreed to alert the hijackers if anything went wrong.

After the truck was stolen Mason, Gonsalves, Lane, and Peter Carter—the third codefendant at the joint trial—unloaded three pallets of film at the Woburn residence. They departed with the truck when the owner of the house arrived, and called Lawrence Skelton to ask if they could unload the remaining film at his Billerica, Massachusetts, home. Skelton agreed and assisted them in unloading the film there. After the truck was driven off and abandoned, Skelton, Mason, Gonsalves, and Lane obtained a U-Haul truck and brought it to Skelton's house to load it with film. On March 31 Lane and Rosa met Gonsalves and Skelton at Skelton's place to load a second U-Haul truck with film. Lane, Rosa, and Gonsalves drove this truck to Cerullo's home and unloaded it. They then drove to Lane's Woburn home and loaded the truck with the film that had been left there.

Eventually all of the film was sold to various buyers; Cerullo paid Lane about $100,000 for the film he received. Lane retained $30,000 of the overall sales proceeds and paid, directly or indirectly, $30,000 to Gonsalves, $30,000 to Mason, $24,000 to Smoot, and $1,500 to Carter. The appellants, Rosa and Skelton, received $1,000 and $3,500 respectively.

A substantial portion of the prosecution's case at the joint trial of Rosa, Skelton, and Carter comprised the testimony of Lane, Gonsalves, and Mason. Each of them admitted to a long history of criminal behavior in addition to this hijacking. They each had bargained with the government for their testimony and had received in return various promises and considerations.

I. *Evidence of a Death Threat to a Witness Made by Defendant Skelton*

During the trial Lane testified that in March or April of 1981 he had had a conversation with Skelton during which Skelton threatened to kill him if he became a government witness. Skelton argues that this alleged threat was improperly admitted into evidence because, under Federal Rule of Evidence 403, its tendency to cause unfair prejudice outweighed its probative value.

■ We first note that Skelton has waived this argument on appeal because he did not raise it at the trial. During a conference at the bench both the trial judge and defense counsel were made aware of the prosecutor's expectation that Lane would testify about the threat. The judge expressed to Skelton's counsel his willingness to give a limiting instruction if requested. Counsel neither objected to the testimony nor requested a limiting instruction.

Even assuming that the issue has not been waived, we think the district court did not act improperly in admitting Lane's testimony. This court has held that "[e]vidence of threats to witnesses can be relevant to show consciousness of guilt." *United States v. Monahan,* 633 F.2d 984, 985 (1st Cir.1980) (per curiam) (citing Fed.R.Evid. 404(b)). Such threats may imply that the defendant "has something to hide" or a "desire 'to cover something up.'" *United States v. Gonsalves,* 668 F.2d 73, 75 (1st Cir.) (citing 2 Wigmore on Evidence §§ 273–77 (Chadbourne Rev.1979)), *cert. denied,* 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982).

■ Although tending to prove consciousness of guilt, evidence of a threat to a witness should not be admitted if its probative value is "substantially outweighed" by the danger of undue prejudice. Fed.R. Evid. 404 advisory committee note. In *Monahan,* which concerned a threat of "unspecified" harm and not a death threat, we reserved the question of whether an "inflammatory or macabre" threat should be excluded under Rule 403. 633 F.2d at 985 (citing cases in other circuits holding that evidence of inflammatory threats tending to portray defendants as unusually violent is extremely prejudicial and should be ex-

cluded). Subsequently *Gonsalves* provided us an opportunity to consider a death threat. Our analysis in that case clearly controls here.

■ In *Gonsalves* we noted that a district court's weighing of probative value against unfair prejudice is reviewable on appeal only for abuse of discretion. 668 F.2d at 75 (citing *Dente v. Riddell, Inc.,* 664 F.2d 1, 5 (1st Cir.1981)). The trial judge in that case had expressly weighed probative value against prejudice as required by Rule 403 and we found no abuse of discretion. In the instant case the judge was not as explicit in weighing these factors. Nonetheless, his invitation to Skelton's attorney to request a limiting instruction if desired suggests that he had come to the conclusion that the danger of unfair prejudice did not outweigh the probative value of the evidence. The judge had no need to be more explicit because, unlike in *Gonsalves,* defense counsel did not object to the evidence on the basis of unfair prejudice.

■ The judge exercised his discretion reasonably. As in *Gonsalves,* 668 F.2d at 75, the government had a substantial need for supplementary evidence; the prosecution's case was based largely on the accomplices' testimony about the hijacking and any evidence showing consciousness of guilt was significant. Defense counsel had the opportunity to cross-examine Lane on his testimony about the threat and we think the court could reasonably have concluded that the ultimate probative weight of the evidence was best left to the jury to decide.

Furthermore, the statement does not appear to have been particularly inflammato-ry. We reached the same conclusion in *Gonsalves* in which the defendant made the statement "[t]hat broad is dead" in referring to a putative witness. 668 F.2d at 76. The statement here, made during a conversation with Lane after Skelton had received word that Lane might become a government witness, could be viewed as an emotional or impulsive reaction. As such it would have a less prejudicial impact than evidence of calculated, advanced plans to commit one or more murders, such as the evidence considered in *United States v. McManaman,* 606 F.2d 919, 923–26 (10th Cir.1979), and *United States v. Weir,* 575 F.2d 668, 669–71 (8th Cir.1978). Although a death threat of any kind is inflammatory and triggers concern about the dangers of prejudice, we do not think the trial judge abused his discretion in admitting the evidence of Skelton's threat to kill Lane.

■ Skelton presents a second argument under Federal Rule of Evidence 403 concerning Lane's testimony leading up to his statement that Skelton had threatened him. As Lane was questioned by the prosecutor about his conversation with Skelton during which the threat occurred, he apparently started to testify that Skelton had said he had heard from a person who had heard from Ira Feinberg that Lane was going to be a government witness. Ira Feinberg is the brother of Skelton's attorney and represented codefendant Carter. Lane's testimony was interrupted by defense counsel's immediate objection after he mentioned Feinberg's name. After a conference at the bench the judge instructed the jury on the matter [1] and allowed the prosecutor to ask a "bottom line" question designed to elicit

---

1. The judge instructed as follows:

Mr. Foreman and members of the jury, it is not my intention to give you a lecture on all the intricacies of the law of hearsay, but in the last question and part of an answer the name Ira Feinberg was mentioned. Ira is an attorney associated with this case. He is the brother of Matthew Feinberg, as I have explained to you before. And Ira Feinberg may be coming into this courtroom later. I don't want the wrong impression to be gained by reason of the fact that Ira Feinberg's name was mentioned. Ira Feinberg's name, if I had allowed the conversation to come in, would have been mentioned simply in the sense that Mr. Feinberg said something which was repeated by another person and further statements were made.

Nothing is to be taken adversely to Ira Feinberg or his brother Matthew or anybody else sitting at the back table. Therefore, in order to avoid any unfair inference that might be made, I have instructed the Assistant United States Attorney to ask what I call the bottom line question of Mr. Lane and to ask Mr. Lane to give a bottom line answer without references of that type.

directly Lane's testimony about the threat. Skelton's attorney moved for a mistrial on the basis that an instruction would be inadequate to clear up the confusion and erase any inference of a connection between the attorney, his brother, and the threat, or of a link between Skelton and Carter. The trial judge denied the motion and Skelton now argues that the judge erred. Our review of the record leads us to conclude that the instruction was indeed adequate and that the trial judge handled this situation in a proper manner.

## II. *Prosecutor's Alleged Injection of Personal Opinion into His Argument*

■ Both Skelton and Rosa argue that their convictions should be reversed because the prosecutor injected his personal opinion into his argument and because the judge did not give a curative instruction. It is settled law in this circuit that a prosecutor may not inject into his jury argument his personal opinions about conclusions to be drawn from the evidence. *See, e.g., United States v. Flaherty,* 668 F.2d 566, 596 (1st Cir.1981); *United States v. Gonzalez Vargas,* 558 F.2d 631, 633 (1st Cir.1977); *United States v. Farnkoff,* 535 F.2d 661, 668 (1st Cir.1976); *Patriarca v. United States,* 402 F.2d 314, 320–21 (1st Cir.1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). The statement about which appellants are primarily concerned occurred during the prosecutor's rebuttal argument, immediately after the codefendants' closing arguments. To put it in context we must first review these closing arguments.

Attorneys for both Skelton and Rosa spent considerable time during their closings attacking the credibility of Mason, Lane, and Gonsalves and suggesting that their agreements with the government had motivated them to fabricate their testimony. The closing of Skelton's attorney included the following statements:

> [The government's witnesses] are cold, calculating, conniving criminals, professional criminals, lifelong professional thieves. Men who on the street for money or an advantage will lie, cheat, steal, and resort to violence.

> And what happened to these men? They got caught.... And when they got caught, what did they have to deal with?

> All they had to deal with is phony information, phony stories.

> . . . .

> ... They need the government. They need to show the government that they are doing their part. And they need the government, because that's their ticket; that's their key to the jailhouse door.

> And the way they can get that key and turn the lock and walk out into the clear, bright sunshine is to get on that witness stand and lie to satisfy the government.

Counsel for Rosa continued in the same vein, likening the government's use of testimony from Mason, Lane, and Gonsalves against Rosa to going fishing and "using a whale to catch a minnow." His argument then included the following comments:

> And we have the United States Government spending your money and mine trying to get some little fish . . . .

> ... Does it not gripe you that the people who do the dastardly deeds are the ones who get the breaks? The ones who escape punishment?

> . . . .

> But you say that a cop did something wrong, and everybody is quick to jump on the band wagon [sic] and crucify him, including the United States Government as is obvious by the conduct in this particular case because they operated—they operated—to give a break to a drug pusher and a man of violence and a liar and a thief in exchange for the chance that they could nail a cop . . . . But yet the United States Government chose to exercise all of its resources and come down on the head of a lowly police officer simply because he is a police officer.

The prosecutor opened his rebuttal with the statement appellants now label an injection of personal opinion:

> Ladies and gentlemen, I will attempt to be brief in my remarks. Let me say as a first thing, the government, and I, per-

sonally, make no excuses for this case. The government has presented its evidence and it made its deal. We stand by as we presented it before you. The government makes no apologies for what it did in this case.

Counsel for Skelton and Rosa objected at the conclusion of the rebuttal; the trial judge overruled the objections, stating that to view the statement as the injection of personal opinion would be "reading a little too much" and that "I think it was a fair comment in the light of what went on about statements."

██ We have been concerned in prior cases that a prosecutor's expression of opinion implies knowledge of information not before the jury and places in issue the credibility of counsel, with the government holding an advantage. *E.g., United States v. Cain,* 544 F.2d 1113, 1116 (1st Cir.1976) (quoting *Patriarca,* 402 F.2d at 321). Certainly the prosecutor here did not suggest that he had information not placed before the jury; he emphasized that the government stood by the case as it had been presented. We agree that it would be "reading a little too much" to conclude that the prosecutor's statement that he personally would make no excuses for the case either suggested to the jury the existence of inside information to support a verdict of guilt or placed the prosecutor's credibility in issue. *Cf. Flaherty,* 668 F.2d at 597 (no reversible error when government's opening statement expressed confidence that the evidence would demonstrate guilt); *Cain,* 544 F.2d at 1116 (neither inside information implied nor credibility of prosecutor put in issue by comment in closing argument that the government has proven guilt). Without intending to imply that provocation by defense counsel in closing argument would justify a retaliatory statement of personal opinion by the prosecutor, *see Patriarca,* 402 F.2d at 321 n. 6, we think that the attacks by defense counsel on the government's handling of the case neutralized any potential harm that could have stemmed from the prosecutor's comment. *Cf. United States v. Capone,* 683 F.2d 582, 586 (1st Cir.1982) ("virulent arguments" by defense counsel tended to neutralize inflammatory remarks made by prosecutor during rebuttal).

Skelton suggests that several other comments made by the prosecutor during closing argument also constituted the injection of personal belief. Again, however, having read the statements in context we cannot conclude that these remarks either implied inside information or made credibility of counsel an issue. They focused the jury's attention on the evidence that had been presented and did not approach the improprieties committed in the cases Skelton relies on, especially *Gonzalez Vargas,* 558 F.2d 632–33 (four statements of opinion, including "I personally believe that I have proven the case of the United States much more beyond a reasonable doubt as the law requires but beyond any doubt").

### III. *Trial Judge's Charge to the Jury on Aiding and Abetting*

██ Appellants next claim that the judge's instructions to the jury did not sufficiently define the elements of aiding and abetting or state with sufficient clarity that before a jury could convict a defendant of aiding and abetting it must first have found that the substantive offense was committed. We note initially that, although defense counsel objected to the aiding and abetting instruction because it gave "the government two bites of the apple to convict," counsel never objected to it on the particular grounds now argued on appeal. Thus we will only review the instruction for plain error. *See United States v. Provenzano,* 334 F.2d 678, 689–90 (3rd Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). Under this standard we are not concerned with technical or prejudicial errors, but only with errors " 'affecting substantial rights' " or " 'seriously affect[ing] the fairness . . . of judicial proceedings.' " *McMillen v. United States,* 386 F.2d 29, 35 (1st Cir.1967) (quoting Fed.R. Crim.P. 52(b) and *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936), respectively), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288

(1968); *see also Capone,* 683 F.2d at 588; *United States v. Previte,* 648 F.2d 73, 81 (1st Cir.1981).

At first reading, the instruction here appears to define aiding and abetting adequately as it closely tracks the statutory language that one who "aids, abets, counsels, commands, induces or procures" the commission of a crime is punished as a principal. 18 U.S.C. § 2(a) (1976).[2] And in fact the Supreme Court has explicitly found that a jury charge repeating this statutory language verbatim was adequate to define the crime, while recognizing that other courts have set out the elements of aiding and abetting in perhaps more helpful language. *Nye & Nissen v. United States,* 336 U.S. 613, 618–20, 69 S.Ct. 766, 769–770, 93 L.Ed. 919 (1949); *accord United States v. McCoy,* 539 F.2d 1050, 1064 (5th Cir.1976), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). *But see Nye & Nissen,* 336 U.S. at 628, 69 S.Ct. at 774 (Murphy, J., dissenting). We think it clear that, insofar as it defines aiding and abetting, the charge here does not rise to the level of plain error.

We also find that the charge does not constitute plain error in its manner of indicating that the commission of a substantive offense is a requisite of aiding and abetting. The trial judge stated that to be convicted as an aider and abettor the defendant must have "assist[ed] someone else" and "advise[d], counsel[led], procure[d], command[ed], or induce[d] *the violation which is spelled out in either Count 2 or Count 3.*"

(Emphasis added.) The emphasized language plainly refers to a crime which has been committed. *See McCoy,* 539 F.2d at 1064. The judge's failure to state more explicitly the requirement that the substantive crime has been committed was not plain error.

## IV. Trial Judge's Refusal to Caution the Jury about the Testimony of a Witness under Treatment for a Mental Condition

During cross-examination Gonsalves acknowledged that he had been institutionalized several times for a mental condition and that at the time of the trial he was receiving medication for this condition. Defense counsel requested the judge to instruct the jury to consider the testimony with "great care" and determine whether or not Gonsalves' condition or his medication impaired his ability to perceive and communicate the truth.[3] Rosa now argues that the trial judge's failure to so instruct the jury and refusal to allow extrinsic evidence of Gonsalves' condition denied Rosa's right to a fair trial.

Rosa relies on *United States v. Kinnard,* 465 F.2d 566 (D.C.Cir.1972), and a line of cases concerning the testimony of addict/informers. The *Kinnard* court's holding was limited to a narrow category of witnesses who are narcotics addicts and paid government informants. The theory behind requiring a special instruction on the testimony of such witnesses is that addicts suffer an intense physical craving which increases

---

2. The pertinent portion of the judge's instructions on aiding and abetting was as follows:

So those are two federal statutes. I may be a violator as far as Count 2 is concerned and a violator as far as Count 3 is concerned provided that you find beyond a reasonable doubt, as I have defined it, each of those essential elements of the crime which is charged in the particular count. On the other hand, I may not have actually participated in the violation itself, I may ... be an aider and abettor as far as the substantive violation is concerned. If I assist someone else, if I abet, that is aid to the extent that I am capable of aiding, if I advise, counsel, procure, command, or induce the violation which is spelled out in either Count 2 or Count 3, then even though I am simply an

aider or an abettor, I am treated as a principal.

3. Defense counsel requested the following charge:

There was testimony that the witness, Henry Gonsalves, suffers from some type of mental condition and that as part of the treatment of the condition he takes drugs. If a witness suffers from a mental condition requiring treatment with drugs, there are additional reasons why his testimony must be considered with great care. You must, of course determine whether or not the mental condition and the effect that the drugs may have on the person distort their views of reality, hence their ability to perceive and relate the truth.

the danger that they will misstate the truth to satisfy the government.[4]  *Id.* at 571.

■ The short answer to Rosa's claim is that there was no evidence of Gonsalves being an addict.  Indeed, the instruction Rosa requested at trial indicates concern with Gonsalves' ability to perceive and relate the truth, not with a deliberate misstatement because of the desire to please the government.  The court in *United States v. Hoppe,* 645 F.2d 630, 633 (8th Cir.), *cert. denied,* 454 U.S. 849, 102 S.Ct. 170, 70 L.Ed.2d 138 (1981), listed factors that obviate the need for an addict/informer instruction.  All of those factors are present to some degree in this case: defense counsel cross-examined Gonsalves about his condition and the effects of his medication;  the judge instructed the jury to exercise care in receiving the testimony of accomplices who had bargained with the government;  and the testimony of. Gonsalves was corroborated by the testimony of others.  We think the jury was adequately apprised of Gonsalves' condition and medication and its possible effect on his testimony.  There is no general rule that a court must comment upon the possible unreliability or testimonial weaknesses of every witness.  There are only a few special exceptions.  This is not one.

AFFIRMED.

---

4.  As the *Kinnard* court explained:

The addict's habit makes him uniquely subject to constant surveillance and susceptible to arrest—he is in a perpetual status of violating the law.  For the addict, arrest is harassment of a special sort, for he is forced to undergo the beginnings of withdrawal symptoms.  At this stage, a bribe of heroin or the promise of immediate release and return to the habit seem irresistible.....

....

Furthermore, the addict is only valuable if he produces fruitful tips or arranges sales which lead to prosecutions.  The addict-turned-informer may therefore be desperate not only to produce results for the police, but also to avoid retribution from powerful figures in the drug trade.  This desperation may well lead him to lie, and increases the danger that he will misrepresent the involvement of those whom he fingers.

465 F.2d at 571 (footnotes omitted).